In re ADOPTION OF A MINOR.

No. 9104.

United States Court of Appeals District of Columbia.

Argued March 28, 1946.

Decided May 20, 1946.

---

GRONER, C. J., dissenting.

Mr. Justin L. Edgerton, of Washington, D. C., with whom Mr. Leo A. Rover, guardian ad litem, of Washington, D. C., was on the brief, for appellant.

Mr. Nicholas J. Chase, of Washington, D. C., for appellees.

Before GRONER, Chief Justice, and EDGERTON and PRETTYMAN, Associate Justices.

PRETTYMAN, Associate Justice.

This is an appeal from a judgment of the District Court granting adoption of an infant, and from an order denying a motion of the natural mother to vacate the decree of adoption and either to reopen the case for the introduction of further evidence or to grant a new trial on the ground of newly-discovered evidence.

The father and mother of this infant first met in the fall of 1941 in a southern town where they both lived. The child was conceived there out of wedlock in June, 1943. Almost immediately thereafter the father, who was then in the armed forces, entered an officers' training school in New York. He received his commission in October and was thereafter ordered to Boston. He and the mother saw one another from time to time until January, 1944. He was then promised a 48-hour leave, and they planned to be married in Boston during that period. Two days before it was to begin, his leave was cancelled, he was ordered aboard ship and sailed for the Pacific on combat assignment. The baby was born March 1, 1944. The mother signed a consent to the adoption on March 7, 1944, and the proposed adopters immediately took custody of the child. Early in April the mother sought the assistance of welfare authorities and was referred to the Legal Aid Bureau. A petition for the adoption was filed by the proposed adopters in late April, 1944.

The adopters averred that the father of the infant was unknown to them. The mother, having already given notice of the withdrawal of her consent, answered. She averred that the father had acknowledged paternity and that a marriage by proxy was in course of arrangement, and asserted that she withdrew the consent she had given. The petition was referred to the Board of Public Welfare, and an exhaustive report was filed, which contained, among other things, the name, full description and then address of the natural father. He was on combat assignment in the Pacific. The report stated, "Investigation indicates that [the baby] is not available for adoption since the natural father who has both acknowledged paternity and contributed over one thousand dollars for support does not consent to the adoption." The petitioners filed objections to the report.

The record does not show any attempt by anybody to notify the father of the pendency of the proceedings or to secure from him any authoritative statement of his attitude or wishes. The proceeding came on for hearing during February, 1945, and extensive testimony was taken. The father was still on combat assignment in the Pacific. He was not represented at the hearing, and his actions and attitude were evidenced by testimony of the mother and by his letters to her. It appeared that beginning with October, 1943, when he received his commission, he had sent the mother various amounts of money each month, until he had sent a total of about $1,000. He stopped sending funds in April or May, 1944, after the baby had been placed in the custody of the proposed adopters. When he began these payments, he wrote, "Naturally I'll let you have every cent I possibly can. $180 a mo. is about the max." The mother testified that she and the father had been in constant correspondence from the time he left the country; that he was very much conscience-stricken on the one hand but, on the other hand, was reluctant to accept his responsibilities; that he had agreed to a proxy marriage if she could arrange to have the papers sent him, but that he later changed his mind and did not send the papers back; that she wrote him that mar-

riage was necessary and that she would refer the matter to his superiors, which she did. As a result, in September, 1944, he wrote that the authorities could not force him into marriage and that he would "contest paternity to the last ditch." The mother explained his attitude by the facts that he was in a battle area and that his mail was censored by brother officers with whom he associated constantly, but she said that she felt that he would come immediately to her upon his return to this country, and pointed to the fact that he had never stopped writing her.

In the letters to the mother, introduced in evidence, written between October, 1943, and late April, 1944, the father acknowledged responsibility for her condition by repeated expressions of contrition, pleadings for forgiveness, assertions of affection, interest in how she was, acquiescence in the proposal for proxy marriage, and unqualified offers of financial assistance to the full of his ability. He made a jesting suggestion concerning the name of the baby and, after it was born, cautioned the mother in affectionate terms against going to work until she was absolutely well.

The father returned to this country in April, 1945, and he and the mother were married almost immediately. Thereupon the mother filed the motion to which we have referred and attached to it an affidavit of the father which recited, among other things, an unequivocal acknowledgment that he was the father of the child, his voluntary contributions over a period of. months in recognition of his obligation to the mother and to the child, and a categorical denial of consent, past or present.

The statute provides:[1]

"Jurisdiction is hereby conferred upon the District Court of the United States for the District of Columbia to hear and determine petitions and decrees of adoption of any adult or child (hereinafter called adoptee) with authority to make such rules, not inconsistent with this section and sections 16—202 to 16—207, as shall bring fully before the court for consideration the interests of the adoptee, the natural parents, the petitioner, and any other properly interested party."

It further provides:[2]

"If adoptee is under twenty-one years of age, no decree of adoption shall be made unless the court shall find that the following persons have consented to the adoption: Adoptee, if fourteen or more years of age; and the natural parents or adoptive parents by a previous adoption, if living. The consent of the father of an adoptee born out of wedlock shall not be necessary unless he has both acknowledged the adoptee and contributed voluntarily to its support."

We do not find in the scant provisions of Rule 50 of the Local Civil Rules, which encompasses the whole of "Adoption Rules", compliance with the statutory mandate inherent in the provision first above-quoted. This adoption law was carefully designed.[3] The provision quoted was a well-grounded recognition of the fact that adoption proceedings are not merely ordinary law suits, that they require special rules, and that to bring fully before the court for consideration the interests of the natural parents, is a problem of peculiar difficulty. It is a difficult problem in a case involving a proposal to adopt a legitimate child. It is a more difficult one when the child was born out of wedlock. In the latter case, the father may be unknown. He may be known to the mother only. Although named by the mother, he may deny his identity. Even where his identity is certain, his whereabouts may be unknown. Notice by publication is not available as a process, because the interests of the child dictate that publicity must be avoided to the fullest possible extent in these proceedings. Congress placed upon the District Court the responsibility of designing rules which will operate to the specified end under these difficulties.

The major premise underlying this law is the unity of the natural family. The basic public policy is that the natural father and mother of a child have responsibilities

[1] D.C.Code (1940) § 16—201.
[2] D.C.Code (1940) § 16—202.
[3] In re Adoption of a Minor, 1944, 79

U.S.App.D.C. 191, 144 F.2d 644, 156 A. L.R. 1001.

in respect to it and have corresponding rights.[4] Proceeding from that general premise, the statute carves out a process which will operate when the natural relationship goes awry. This process of adoption is for the protection of the child when the natural parents, if living, either repudiate, in the case of the mother, or fail to admit, in the case of the father, their responsibilities. The rule which is announced as the general rule,[5] or as the rule under some statutes,[6] that the father is not a "parent" of an illegitimate child within the meaning of adoption laws, has no application here. This statute uses the plural, "natural parents"; reference to more than one parent necessarily includes the father. Moreover, the statute specifies the circumstances under which the consent of the father need not be secured; the meaning is clear that otherwise it must be secured or failure to do so explained.

 The acknowledgment of the adoptee by the father, included in the second above-quoted provision of the statute, is a definitive acknowledgment. A fact of human behavior is that the putative father of a child born out of wedlock is likely to admit to one person and deny to another. The statute does not leave his rights as a father to supposition upon conflicting testimony, he being known and available to process. The provision that the court shall, by special rules, insure that his interests are fully before it, means that the court shall insure, to the fullest practicable extent, that his failure to acknowledge the adoptee is a definitive act. If he is known and available to personal process, that act may be a failure to respond. The statute wisely requires an affirmation on his part, so that he cannot by mere silence defeat a procedure which, under such circumstances, would seem to be for the best interest of the child. But the statute unequivocally requires that, to the full extent of the ability of the court,

he must be afforded the opportunity to register his definitive attitude.

 In this particular case, another consideration is important. If this father had been formally notified of this proceeding and of his rights in respect to it, as he could readily have been through Government channels, he would have had rights under the Soldiers' and Sailors' Civil Relief Act of 1940.[7] This court has said:[8]

"We conclude that the language of the Soldiers' and Sailors' Civil Relief Act of 1940 contemplated and included a proceeding such as the present one. It would be difficult to imagine a case in which the interests of a service-man would be more seriously affected than one calculated to deprive him of his child, and to make some other person, by act of law, a father in his place. His interests will be as seriously affected, by the determination reached in this proceeding, as they could possibly be in any proceeding which, pursuant to the chance of applicable rules, might require formal designation of parties as plaintiff and defendant."

That case concerned a legitimate child, but, under our statute, the rights of the father of an illegitimate child in respect to adoption are the same as if the child were legitimate, if the father chooses to assert those rights. These rights of a service man could not be nullified by a failure to notify him officially of the pendency of the action. In this case, as we have pointed out, his name and address were known to all parties long before the hearing was had.

 We hold that it was error for the court to enter the decree of adoption when the interests of this father were not fully before the court for consideration, his name and location being known, and he having been afforded no opportunity to present to the court an acknowledgment of the adoptee. If, being afforded that opportunity, he fails to acknowledge the child, his consent is not

---

4 An interesting discussion of the problem under the New Zealand Infants Act, 1908, is to be found in "Adoption of Illegitimate Child", XVIII New Zealand Law Journal, p. 164.

5 E. g., 2 C.J.S., Adoption of Children, § 21; In re McLean, 1919, 109 Misc. 479,

179 N.Y.S. 182; Notes (1911) 30 L.R.A., N.S., 152.

6 Ill.Rev.Stat. (1945) c. 4, § 4—1; Wis. Stat. (1939) § 322.04.

7 54 Stat. 1181, 50 U.S.C.A.Appendix, § 521.

8 In re Adoption of a Minor, 1943, 78 U.S.App.D.C. 48, 50, 136 F.2d 790, 792.

necessary under the statute. If he does acknowledge it, his consent is necessary, in view of what we have to say concerning his contribution to the support of the adoptee.

■ We are not to be understood as holding that notice to the father is jurisdictional. The requirement is one of procedure and of essential fact. The statute makes jurisdiction depend upon the residence of the petitioner. We are not here dealing with the technicalities of indispensable parties. The matter of consents arises in the course of the proceeding. The consents of the natural parent, or parents, may be dispensed with under certain circumstances even if the child is legitimate.[9] The existence of consents, facts which justify failure to secure them, and circumstances which permit their being dispensed with are part of the procedure of reaching a just judgment. The opportunity to be afforded the father to acknowledge an illegitimate child, is part of that procedure.

■ It is uncontradicted that this father freely and voluntarily sent the mother of this child such sums of money as he could, which were large in proportion to his pay, over the period from the beginning of his receipt of pay until after the child had been placed in the custody of the proposed adopters. The question is one of law, whether such payments were voluntary contributions to the support of the child within the meaning of the statute. We think they were. Certainly the statute does not contemplate that the father would contribute to the support of the child after it had been placed in the custody of the proposed adopters, who thereupon assumed full responsibility for its support. And the statute cannot mean that his contribution must necessarily occur after the birth of the child, because it is a well-established practice, fostered by welfare authorities, for a child born out of wedlock to be placed with the proposed adopters immediately after birth, if it is known or can be ascertained that adoption is contemplated. If it were held that the statute requires a contribution after the birth of the child, the fathers in a great majority of cases would be denied their rights. That is not the policy of the statute. The policy is that if the natural father recognizes and meets his responsibilities, he has the rights of a father and his consent to an adoption is required. In cases in which a period of time elapses between the birth and the assumption of custody by proposed adopters, the father has the responsibility of support during that period, and in such cases, if he did not voluntarily contribute at that time, he might forfeit his right in respect to consent. But in a case such as the one at bar, where he contributed regularly during the months preceding birth and until the child was taken by the proposed adopters, it cannot be held, as a matter of law, that he did not contribute to the support of the child.

These are difficult cases, indeed the time-honored classic examples of difficulty in the administration of justice. This child has been with the proposed adopters for two years. The breaking of the bonds thus formed would be harsh. But the statute provides that the child must be with the adopting parents for at least six months before a decree of adoption can be entered, and thus the statute itself creates a potential heartbreak. Moreover, if there be a contest, the resulting litigation takes time, and so the very steps necessary to reach a just result aggravate the difficulty initiated by the statute. The policy which prescribes a six-month delay before a decree of adoption can be entered, is a sound one, reached after careful study by those experienced in such matters. If a contest be indicated, as was the case early in the present proceedings, the proposed adopters are forewarned

---

9 D.C.Code (1940) § 16—202, last paragraph: "The consent of a natural parent, or parents, or adoptive parents by a previous adoption, may be dispensed with (1) where after such notice as the court shall direct it shall appear to the court that such person or persons can not be located; (2) where they have been permanently deprived of custody of the adoptee by court order; (3) where it shall appear to the court that they have abandoned the adoptee and voluntarily failed to contribute to his or her support for a period of at least one year next preceding the date of the filing of the petition; or (4) where investigation has shown to the satisfaction of the court extraordinary cause why such consent should be dispensed with."

of the possibility of a disruption of plans formulated with the highest of motives. Moreover, in the present case, the petitioners are not entirely without blame, in that they took no steps to cause notice to be transmitted to the father, although they were informed of his name, post-office address and official location.

The judgment of the District Court is reversed. We leave to the discretion of that court whether it shall appear, after inquiry, that the best interests of all concerned would be served better by a new trial or by a reopening of the proceeding to receive such evidence as the father may present. We suggest to that court the desirability of giving precedence to this case in view of the time which has unavoidably elapsed and of the aggravation of the difficulties which delay might cause.

Reversed.

GRONER, C. J. (dissenting).

I have no quarrel with the opinion of the court in the respect in which it outlines steps which might very well be taken by trial courts in relation to the adoption of minors in the District of Columbia. My dissent is bottomed wholly on the conclusion that in the instant case the District Court proceeded strictly in accordance with the local statutes and I can find nothing in anything it did to indicate an abuse of discretion. Accordingly, I believe that in the facts of this case neither the consent nor the presence of the putative father was necessary in the adoption proceedings. Here the record shows that the putative father, although overseas, was in constant correspondence with the natural mother, both before the child was born and during the adoption proceedings some six months later. Notwithstanding this, it is plain that at no time did he acknowledge the child or assert any interest in his future or well-being. At no time did he attempt to intervene in the adoption proceedings and he does not do so now. His only affirmative action, in the form of an affidavit, comes some fourteen months after the proceedings for adoption were begun. This court has said many times that it is the function of the District Court to determine the best interests of the infant, and my judgment is that recognition of that rule in the facts of the present case would be the wiser course to pursue.