**Louise Flood BELL et al., Appellants,**

v.

**Gwendolyn Hairston LEONARD, Appellee.**

**Alonzo BELL and Louise Virginia Bell, Appellants,**

v.

**Gwendolyn Hairston LEONARD, Appellee.**

**Nos. 13764, 13999.**

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 13, 1957.

Decided Jan. 9, 1958.

Mr. Josiah Lyman, Washington, D. C., for appellants.

Mr. Harry E. Taylor, Jr., Washington, D. C., for appellee.

Before WILBUR K. MILLER, FAHY and DANAHER, Circuit Judges.

DANAHER, Circuit Judge.

Appellee Leonard in No. 13764 successfully sought, through habeas corpus, the control and custody of her 9-year-old daughter, and appellant Louise Bell has appealed from the District Court's order. The trial judge, having permitted vindication of the mother's right, thereafter dismissed a co-pending petition for adoption of the child. Appellants Alonzo Bell and Louise Bell[1] in No. 13999 seek review of the order dismissing their petition, and on their motion we have consolidated the two cases.

Appellee Leonard had alleged that she and appellant Bell are residents of the District of Columbia, where the child was born to appellee Leonard on January 25, 1948. She further alleged that some time during the month of May, 1948, "The respondent [Bell] took the said child from the petitioner on the pretense that she would keep the child for less money than petitioner had been paying; that said respondent has unlawful custody and possession of said child * * * and refuses to surrender custody and possession * * * to your petitioner who was lawfully entitled thereto under the memorandum of the court dated August 17, 1953, filed by Judge Walter M. Bastian in habeas corpus No. 34–53, which was one of several prior proceedings of this petitioner to regain custody and possession of her child."

The record reflects the earlier tangled lives of the two principals. At least in 1948, and perhaps until each married, their unconventional paths led them to an establishment operated by a brother of the appellant Bell. There Bell's brother Garfield worked "behind the bar selling whiskey and renting rooms." Appellee Leonard testified she was pregnant with the innocent subject of this litigation when she first met Garfield Bell. Appellant Bell was later to claim that her brother had fathered the child, but, if so, after the baby was born the putative father contributed nothing to the mother for the child's support. The mother testified that when in sore straits, jobless, yet caring for the infant, she and her baby were taken in by a Mrs. Owens whose quarters were also visited by appellant Bell. The latter, learning of the mother's difficulties, "saw the child and she said she wouldn't mind keeping it; she would keep it for less money." Appellant Bell, then living with a man who provided accommodations, was able to receive the child while the mother worked during the week. She sought to take her child on weekends, but "She wouldn't let the child stay with me on weekends. I said: 'Well, if she can't stay with me on weekends, I'll take my baby altogether.' And she said: 'Over my dead body.' "

The mother thereafter spirited her child from the care of another woman with whom appellant Bell had temporarily left her. Appellant Bell called police under whose direction the mother return-

---

[1] Simply as a matter of convenience, we will hereinafter refer to appellant Bell and appellee Leonard. The joinder of Mrs. Bell's husband and the nonjoinder of Mrs. Leonard's husband are alike immaterial here. The name of appellant's husband appears only in that he had joined her in filing the adoption proceedings while the right of the appellee stems from her status as mother. Her husband is not the father of the child and made no claim in the habeas corpus action.

ed the child to appellant Bell. In 1950 the mother instituted habeas corpus proceedings in which no final order was signed, and the case was later dismissed under the District Court's rule. In 1951 appellee Leonard married a sergeant in the Army, and, in 1953, again instituted habeas corpus proceedings, in advance of leaving for France with her husband. After a 2-day trial, Judge Bastian filed a memorandum August 17, 1953, from which we quote:

> "This Court believes that, if the reformation of the petitioner continues, she should be entitled to the child; but the time from the date of the last hearing to the present time has not been sufficient, in the opinion of the Court, to justify the child's transfer to the petitioner at this time. Further than that, the child would be out of the country for nearly three years and, under the circumstances of the case, the Court does not believe that it should direct the surrender of the child to the mother now.

> "Accordingly, the petition will be dismissed and the writ denied *without prejudice. This would mean that the case could be brought again when the petitioner and her husband are again in this country permanently.*" (Emphasis supplied.)

Against the background thus summarized the instant proceedings went forward. Appellee filed a motion for summary judgment, supported by a lengthy affidavit, narrating details as to her present situation, her reformation, and various other circumstances in support of her petition. Refusing to rest on the affidavit, the trial judge denied her motion and after taking testimony entered findings:

> "1. In a prior Habeas Corpus proceeding between the same parties a memorandum dated August 17,

1953 was filed by Judge Bastian, which decided the petitioner * * * who was then to leave this country, should have the custody of [the infant] provided the reformation of the petitioner continued and that application to the Court was made when petitioner and her husband were in this country permanently.

> "2. Petitioner's reformation has continued.

> "3. Petitioner and her husband are now in this country permanently.

> "4. Petitioner has made application in this proceeding for the right to custody set forth in the memorandum filed in Habeas Corpus No. 34–53 on August 17, 1953."

Concluding "as a matter of law that petitioner * * * is entitled to the custody of her child * * *" the trial judge granted the petition, overruled appellant's motion for rehearing and dismissed the adoption petition.

■ We turn first to the adoption proceedings as to which we are satisfied there is no error. It certainly is so that a non-parent may not obtain possession of a child and thereafter invoke the processes of the court to consummate its adoption against the wishes and without the consent of the child's mother.[2] "Consent of the natural parents is required save in certain specified circumstances,"[3] not shown here.

■ Turning next to the habeas corpus proceedings, certain points must be deemed definitely to have been established, by our Code and otherwise. A mother is the natural guardian of her child,[4] even though the child be illegitimate.[5] As mother and natural guardian she has a right to a writ of habeas corpus directed to any person unlawfully detaining her minor child to the end that the child be produced before the court which "upon hearing the proofs, shall

2. D.C.Code, § 16–202 (1951).

3. Barnes v. Paanakker, 1940, 72 App.D.C. 39, 42, 111 F.2d 193, 196.

4. D.C.Code, § 21–101 (1951).

5. Fowler v. Bright, D.C.D.C.1933, 4 F. Supp. 565, 566.

determine which of the contesting parties is entitled to the custody of the person so detained, and commit the custody of said person to the party legally entitled thereto."[6] It is true that a mother's preferential claim may be lost by contract or forfeited.[7] Such conduct may be deemed to "afford very strong evidence of the want of natural affection and the lack of fitness for the charge."[8] No such situation is shown on this record. On the contrary, as we have indicated, the mother's persistent efforts to obtain her child belie any such conclusion here.

Beyond peradventure, courts encounter no keener pathos than surrounds the allocation of a little child. That strangers may develop a tender love for one in their care is abundantly shown in the common experience of mankind. We may presume this is true of this appellant, childless, aged forty-six, who undertook the care of the little girl under the circumstances mentioned. It can readily be understood how the trial judge in 1953 was loath then to return the child to a mother who would have introduced the child to a completely foreign life during an intended 3-year stay in France. While the mother by then had married and apparently had risen above the way of life associated with a portion of her earlier years, the judge continued her period of probation, so to speak, that her current fitness might the more certainly be developed. At the same time, after receiving testimony from the parties throughout a 2-day trial, it is clear he ensconced consanguinity at no less level than is established by the law of nature. Even as he did so, he concluded that the best interests of the child then required that she not be removed from the source of the care she had received over the previous four or five years, only to be sent abroad. Still, with full knowledge of the background of the claiming women, he recognized, and held out assurance, that the day might come when the mother might again seek vindication of her personal right.

Thus it was, as the record discloses, that in the instant case the trial judge received further evidence here. The record presents no suggestion of lack of reformation; quite the contrary. No claim was made, no evidence was offered, to preclude the determination of the trial judge that the mother's right is superior to and must prevail over the interest of the stranger. The trier's judgment reflects that conclusion, correctly reached, we believe.

Appellant would have us say that at this point the ultimate determination of the case is controlled by Holtsclaw v. Mercer,[9] but we do not agree. In that case we but recognized the policy, then so recently voiced by Congress, that once a mother "had voluntarily consented to [the child's] adoption, her consent could not be voided because of minority."[10] In the Holtsclaw case the mother had entered into an agreement which was before this court and from which we quote:

"Recognizing the fact that I am entirely unable to perform the duties incumbent upon me as Mother and wishing my said infant to have a good home and advantages that I would be unable to afford.

"I the party of the second part, hereby relinquish all rights, claims and title to the said infant as its mother and otherwise to the said parties of the second part Mr. and Mrs. Mercer."

The latter, for their part, agreed to take the child "as and for our adopted

6. D.C.Code, § 16–808 (1951); "* * * [C]hildren withheld from the proper parent * * * may * * * become proper subjects of relief by the writ of *habeas corpus*." Wales v. Whitney, 1885, 114 U.S. 564, 571, 5 S.Ct. 1050, 1053, 29 L.Ed. 277.

7. Beall v. Bibb, 1902, 19 App.D.C. 311, 314.

8. Id. 19 App.D.C. at page 314.

9. 1944, 79 U.S.App.D.C. 252, 145 F.2d 388.

10. Cf. In re Adoption of a Minor, 1944, 79 U.S.App.D.C. 191, 193, 144 F.2d 644, 648, 156 A.L.R. 1001; in that case the Act of August 25, 1937, 50 Stat. 803, ch. 774, appearing as ch. 2 of D.C.Code, Title 16 (1951), was thoroughly reviewed.

daughter, do for her the same as if she was our own child and make her by adoption later [our heir] at law equal to our own child." [11]

 What must be kept importantly in mind in any event, here, as in custody situations generally, is that great weight attaches to the action of the trial judge in his determination of what the welfare of the child requires. The Holtsclaw case reemphasized this point. Of course, in the usual custody case we have no such problem as is here presented, and the primary inquiry for the court as *parens patriae* involves what is best for the child. How proper protection of the infant can be afforded may often be the determining factor in adversary actions between parents, who by law are *joint* guardians with equal rights to the child. Situations arising from this aspect of the problem not infrequently [12] have been exhibited to our court as the aftermath of divorce proceedings. Yet another facet of the law's solicitude is found in our Code, whether treating of adoption,[13] or of the child as the object of public welfare,[14] or as a ward in juvenile care cases.[15] Apart from any other phases in such instances, emerging largely from our decisions is the principle that the discretion of the trial court is not subject to our review unless it can be shown that there has been a manifest abuse of discretion.[16] Unless there has been abandonment by a mother or unless she has given final, valid consent to custody in another or unless she has been shown to be unfit to rear her own offspring, in no case has this court been asked to approve a District Court order depriving a mother of custody of her own child and awarding it to a stranger. It may fairly be presumed that the District Court has never entered any such order.[17] Our present problem, unique in this Circuit, finds few counterparts anywhere.[18] Here the welfare of the child is inextricably bound up with the rights of her mother. Thus with the mother's status established as paramount from the inquiry before him, the trial judge awarded custody to the mother. We cannot say he erred.

11. Whether the child in the Holtsclaw case had been legally adopted is not clear, but the written agreement on the basis of which the child had been surrendered to the respondents completely distinguishes the situation from that here presented. "* * * a bargain by one entitled to the custody of a minor child to transfer the custody to another person, or not to reclaim custody already transferred of such a child, is illegal unless authorized by statute." Restatement, Contracts § 583(1) (1932). Cf. In re Adoption of a Minor, supra note 10, where, giving heed to the statute, we refused to permit the mother to repudiate an adoption agreement.

12. See, e. g., for the year 1945 alone, Boone v. Boone, 80 U.S.App.D.C. 152, 150 F.2d 153; Kirk v. Kirk, 80 U.S. App.D.C. 183, 150 F.2d 589; Langan v. Langan, 80 U.S.App.D.C. 189, 150 F.2d 979.

13. Supra note 10; cf. In re Adoption of a Minor, 1946, 81 U.S.App.D.C. 138, 155 F.2d 870.

14. D.C.Code, § 3–114 et seq. (1951).

15. D.C.Code, § 11–901 et seq. (1951); it may be noted that the statutes have also taken account of religious affiliations. See, e. g., D.C.Code, §§ 3–123, 11–918 (1951); cf. Pierce v. Society of Sisters, 1925, 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070, where the Court meeting argument for the State's position said: "The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."

16. Steele v. Steele, 1948, 83 U.S.App.D.C. 254, 256, 168 F.2d 562, 564.

17. Cf. Beall v. Bibb, supra note 7; and see People ex rel. Portnoy v. Strasser, 1952, 303 N.Y. 539, 542, 104 N.E.2d 895, 896: "No court can, for any but the gravest reasons, transfer a child from its natural parent to any other person * * * since the right of a parent, under natural law, to establish a home and bring up children is a fundamental one and beyond the reach of any court, Meyer v. State of Nebraska, 262 U.S. 390, 399 [43 S.Ct. 625, 67 L.Ed. 1012.] * * *"

18. See note 20 infra.

■ Children are not mere playthings; they are human beings entitled to be part of and to participate in their family's life. They should be accorded that status, as Judges Bastian and Curran in their respective orders implicitly recognized. So here, we can not fail to realize that the family unit predicates our entire social structure. "The disciplines, the affections, the achievements, and the sense of security and belonging, which are possible only with [a background of family life], are of the essence in training for participation in modern life."[19] The child is the natural object of the mother's solicitude and of her maternal love. The welfare of the child and its best interests are nourished by and inevitably traced to the wellsprings of the child's life with its mother. Certainly where the mother's right has been established as between her and a non-parent as here, the child's rights in life are by no means to be delimited by merely material indicia, important as they may seem to be.[20] We may suppose that none could have the temerity to suggest that one woman may even kidnap the child of another and thereafter prevail over the mother by a showing that the illicit custodian is financially more secure and better able to provide for the material needs of the child. We may apply the analogy here. In short, " ' * * * the presumption [is] that small children are better off with their mother * * *,' " as we reaffirmed in Bartlett v. Bartlett,[21] thereby merely recognizing the experience of the ages.

We need not prolong the discussion. From the reasoning of our own cases and on principle and authority, as noted, it must be so that a presently fit mother is entitled to her own child as against the claim of a stranger deriving only from circumstances such as here were shown. There was nothing on this record which militates against this mother's right.[22] Certainly there is no demonstration that the trial judge who saw and heard the parties had manifestly abused the discretion he was bound to exercise.[23]

Affirmed.

---

19. In re Adoption of a Minor, supra note 10, 79 U.S.App.D.C. at page 196, 144 F. 2d at page 649.

20. "In no case may a contest between parent and nonparent resolve itself into 'a simple factual issue as to which [affords] the better surroundings, or as to which party is better equipped to raise the child.' * * * And that is true even if the nonparent initially acquired custody of the child with the parent's consent. * * *

"Except where a nonparent has obtained legal and permanent custody of a child by adoption, guardianship or otherwise, he who would take or withhold a child from mother or father must sustain the burden of establishing that the parent is unfit and that the child's welfare compels awarding its custody to the nonparent. * * * In other words, the burden rests, not, for instance, upon the mother to show that the child's welfare would be advanced by being returned to her, but rather upon the nonparents to prove that the mother is unfit to have her child and that the latter's well-being requires its separation from its mother." People ex rel. Kropp v. Shepsky, 1953, 305 N.Y. 465, 469, 113 N.E.2d 801, 804; Skeadas v. Sklaroff, R.I.1956, 122 A.2d 444, certiorari denied 1956, 351 U.S. 988, 76 S.Ct. 1051, 100 L. Ed. 1501; People ex rel. Fentress v. Somma, 1953, Sup., 127 N.Y.S.2d 169.

21. 1954, 94 U.S.App.D.C. 190, 194, 221 F.2d 508, 512.

22. Cf. Meyer v. Nebraska, 1923, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042: "Without doubt, [liberty] denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men."

23. Bartlett v. Bartlett, supra note 21.