Bettie H. DAVIS, Appellant,

v.

John C. JURNEY and Elizabeth H. Jurney,
Appellees.

No. 2162.

Municipal Court of Appeals for the
District of Columbia.

Argued April 21, 1958.

Decided Nov. 6, 1958.

Rehearing Denied Nov. 19, 1958.

Abe M. Goldstein, Washington, D. C., for appellant.

Irving B. Yochelson, Washington, D. C., Solomon Grossberg and Isadore Brill, Washington, D. C., on the brief, for appellees.

Before ROVER, Chief Judge, and HOOD and QUINN, Associate Judges.

ROVER, Chief Judge.

Appellant, the natural mother of James Michael Harbin, filed a complaint in the Domestic Relations Branch seeking custody of her nine-year-old son from appellees, Elizabeth and John Jurney. At the conclusion of a lengthy hearing lasting several days, the trial judge entered an order awarding custody of the child to the Jurneys. Assailing the court's determination on several grounds appellant asks us to reverse this order.

Because of the nature of the case and the circumstances under which the Jurneys originally acquired custody of the child, the facts giving rise to this controversy will be related in substantial detail.

In 1947 appellant married Earl Harbin at Annapolis, Maryland. The parties resided in nearby Maryland and a son, the subject of this proceeding, was born of the marriage. The marriage appears to have been an unfortunate one from the start, marred by quarrels and estrangements due at least in part to financial difficulties. In an attempt to surmount this obstacle, it was decided that appellant should obtain employment. The child, who was two and a half years old at the time and whom we shall refer to as Michael, was placed in the care of a Mrs. Fredericks. He became emotionally upset in these surroundings and a new arrangement was made whereby the boy on weekdays stayed at the home of Mrs. Jurney, a sister of Earl Harbin (the boy's father). The father visited his son on his day off, which fell on a weekday, and on week ends the child was returned to the home of his parents. A sum of $10 per week was paid the Jurneys and in addition appellant and her husband agreed to provide for the child's medical and clothing needs as well as other requirements incident to his maintenance and support.

Despite efforts to preserve the marriage, separations and reconciliations persisted between appellant and her husband until the parties finally separated in October 1953. Michael remained with the Jurneys on a full-time basis and three months later, at the suggestion of appellees, an agreement relating to his custody was prepared by an attorney and signed by the natural parents and the Jurneys. Although appellant and her husband both testified that they did not intend to renounce all rights to their child by this agreement, the con-

tract states that the parties agree "to irrevocably provide for the care, custody and maintenance of the said child." This agreement, which we quote in part further states:

"1. The husband and wife do hereby vest in the Jurneys full and absolute right for the care and custody of the child, imposing in the said Jurneys the full right and authority to raise, educate and provide for said child in such manner as in their sole discretion shall seem best and proper for the said child. * * *

*   *   *   *   *   *

"3. * * * The husband and wife agree that in the event divorce proceedings are hereafter instituted by either of them, they will not seek to disturb, revoke, alter or in any way interfere with the rights of custody given to the Jurneys as herein provided."

The previous financial arrangements with the Jurneys were retained in the agreement and conditions were inserted providing for the restoration of custody to the natural parents in the event they either resolved their difficulties and resumed the marital relationship or they divorced and subsequently remarried one another.

On May 8, 1954, appellant obtained an absolute divorce in Reno, Nevada, from Earl Harbin, who appeared by counsel. In its decree that court incorporated the previously mentioned custody agreement. The following day appellant married a major in the Air Force and returned with him to reside temporarily in this area while the latter was awaiting an overseas assignment. During the succeeding nine months appellant regularly visited her son at the home of the Jurneys in the District and unsuccessfully sought the permission of her former husband to take Michael to Europe. This was refused, according to the testimony, principally because Harbin

felt that a child so young should not leave the country for a period of years.

Appellant joined her husband in Germany in March 1955, her last week and a half in this country having been spent in the Jurney home. Thereafter, letters were constantly exchanged between appellant and the Jurneys. This correspondence, much of which was introduced in evidence, strikingly reveals a close bond of friendship between appellant and Mrs. Jurney and mutual concern for Michael's welfare. As Michael progressed in school, he himself wrote. These letters between mother and son included in the record convincingly demonstrate strong ties of affection.

In October 1957 appellant returned to the District and, accompanied by her former husband who has since remarried, demanded the child. Upon refusal this action was instituted. Appellant is supported in this action by her former husband, who during her absence has maintained a close relationship with his son. We need not discuss further the testimony of the numerous witnesses who appeared, but deem it sufficient to relate that in substance Michael's father testified affirmatively as to appellant's continued love and affection for the child and her fitness to care for him properly. Appellant's present husband has expressed a desire to have the child. His marriage to appellant is a happy one and he is willing to take Michael into his home and treat him as his own child.

As a counterbalance, Michael has lived with the Jurneys for six years. The evidence introduced by appellees indicates that his environment has been a wholesome one, conducive to the well-being of a child in his formative years. The Jurneys have expressed affection for him and have taken an active interest in his youthful pursuits. Under their guidance Michael attends church services regularly and has progressed well in his schooling. In the Jurney home he has his own room, furnished in part by gifts from appellant. The testi-

mony of several witnesses discloses that he is a healthy, normal child, content in this atmosphere.

Michael, who was nine and a half years old at the time of the hearing, testified in open court. In positive statements he expressed his love for his natural mother and father and a liking for appellant's present husband. As to the child's personal preference with respect to the parties to this action, his testimony was not so illuminating. He stated only that he wanted to live with his mother but did not want to leave his school and playmates.

From this evidence the trial judge concluded the Jurneys were fit and proper persons and the welfare of the child would best be served by awarding custody to them.

Several errors are assigned in this appeal. The most salient of these charges a failure on the part of appellees to sustain the burden of showing that the natural parent was unfit to have the child. Appellant further argues that in reaching his conclusion, the trial judge did not consider the mother's preferential claim, but substantially based the award on the written agreement between the parties.

■ The controlling principle by which the courts must be guided in cases of this kind is well settled. The paramount concern is the child's welfare and all other considerations, including the rights of a parent to the child, must yield to its best interests and well-being. While no precise formulae can be devised to aid the court in its determination as to what is best for the child, certainly the application of this broad principle does not demand that the right of a parent be ignored. Under our Code the father and mother are the natural guardians of their minor children.[1] Case law has affirmed this by recognizing the preferential claim of a natural parent in contests involving nonparents.[2] With added consistency the Court of Appeals recently stated in Bell v. Leonard:[3]

" 'Except where a nonparent has obtained legal and permanent custody of a child by adoption, guardianship or otherwise, he who would take or withhold a child from mother or father must sustain the burden of establishing that the parent is unfit and that the child's welfare compels awarding its custody to the nonparent. * * * In other words, the burden rests, not, for instance, upon the mother to show that the child's welfare would be advanced by being returned to her, but rather upon the nonparents to prove that the mother is unfit to have her child and that the latter's well-being requires its separation from its mother.' People ex rel. Kropp v. Shepsky, 1953, 305 N.Y. 465, 469, 113 N.E.2d 801, 804; Skeadas v. Sklaroff, R.I.1956, 122 A.2d 444, certiorari denied, 1956, 351 U.S. 988, 76 S.Ct. 1051, 100 L.Ed. 1501; People ex rel. Fentress v. Somma, Sup., 1953, 127 N.Y.S.2d 169."

■ The foregoing represents no new principle of law, but merely reflects the wisdom of human experience that children ordinarily will be best cared for by those bound to them by the ties of nature. Where compelling circumstances are shown and the best interests of the child require an award to someone else, the court has but one choice. However, such an award can only be justified after the welfare and best interests of the child and the legal and natural rights of the parent have both been carefully considered.

With this in mind we may examine the record in the case before us. The evidence offered by the Jurneys consists largely of an attempt to warrant custody in them-

1. Code 1951, § 21–101.

2. Bell v. Leonard, 102 U.S.App.D.C. 179, 251 F.2d 890; Beall v. Bibb, 19 App.D.C. 311.

3. 102 U.S.App.D.C. 179, 184, 251 F.2d 890, 895.

selves by showing that the child was well cared for. The only departure from this pattern of evidence relating to the natural mother's unfitness is that which confirms the custody agreement between the parties. In this respect we are not assisted to any greater extent by the court's findings. Nowhere does the court state in its formal findings that appellant was unfit to have the child; its only finding of fitness relates to the Jurneys. There is, however, some indication from the court's oral remarks at the conclusion of the case that unfitness on the part of the natural mother could be ascribed to her as a result of the written custody agreement. Although this is not clear, and we make no intimation that the award was based substantially on the agreement, the effect of such an agreement requires some explanation.

A contract or agreement not to reclaim the custody of one's minor children is without legal efficacy in this jurisdiction unless authorized by statute.[4] But while the agreement is not binding, it may furnish evidence reflecting on the parent's fitness. More than fifty years ago Beall v. Bibb, supra, pointed out that the preferential right of a parent may be lost by contract and an actual transfer of custody may "afford very strong evidence of the want of natural affection and the lack of fitness for the charge."[5] We do not think this has ever been held to mean that the making of an agreement and transfer of custody should of themselves be sufficient to establish the unfitness of a parent where other evidence indicates that there was no specific intent to sever all correlative rights and duties incident to the parent-child relationship. As the tenor of the Bell case clearly conveys, the fitness of a parent

must be determined as of the time of the hearing. Evidence of past conduct relating to a parent's fitness should be considered only as an aid to determine the parent's present qualifications.

Appellant's fitness to care for the child was a necessary issue for disposition of the case. While some evidence was offered, we do not think it shows an intent on the part of appellant to renounce and absolutely give up all rights to the child. Nor do we think that the Jurneys have discharged their burden of establishing appellant's present unfitness.[6] Because no findings were made, and there is no indication as to what the judge would have found, we must remand the case for a new hearing. Cf. Schroeder v. Schroeder, D.C.Mun.App., 133 A.2d 470. In such proceedings the agreement and the fact of its incorporation in appellant's divorce decree may be considered, but these factors should be weighed against appellant's association with the child over the years, her efforts to obtain him, and her present suitability to assume the responsibilities of parenthood. Of course, findings should properly be made as to her fitness to have the child.

We would agree with the dissenting opinion in so far as it holds that the fitness of a natural parent is not in issue where the evidence is such as to show an abandonment or a course of conduct revealing a callous indifference to the child's wants. But the evidence here, in our view, does not indicate an abandonment or a settled purpose to forego all parental duties and claims. The parents have continued to support and maintain their son and have never regarded the agreement or the transfer of the child to the Jurneys as being a

---

4. See Bell v. Leonard, 102 U.S.App.D.C. 179, 183, 251 F.2d 890, 894, where the court adopted the rule of the Restatement: " * * * [A] bargain by one entitled to the custody of a minor child to transfer the custody to another person, or not to reclaim custody already transferred of such a child, is illegal un-

less authorized by statute." Restatement, Contracts § 583(1) (1932).

5. 19 App.D.C. at page 314.

6. But see Cooley v. Washington, D.C. Mun.App., 136 A.2d 583, where this burden was not imposed because of the unusual facts which involved an adoption.

final or valid consent to custody. Nor can we agree that this case is dissimilar from Bell v. Leonard in that there were no "persistent efforts" by the mother to regain custody. In Bell the mother invoked the aid of the courts before going overseas with her husband and again upon her return. Here, the mother unsuccessfully sought her former husband's consent to have the child before leaving for Europe. On her arrival back in this country, legal suit was instituted. The dissenting opinion would suggest that "persistent efforts" be measured in terms of legal proceedings. We do not think that one's attempts to obtain custody should be limited to any single method of recourse in order to come within the meaning of "persistent efforts"; other acts manifesting an earnest desire to have the child may be equally significant. Appellant was no less zealous in her efforts than the mother in the Bell case, and her preferential right should not be lost merely because she first sought a peaceful solution to the problem before going to the courts.

■ Finally, we mention parenthetically that no argument has been made that the Nevada divorce decree incorporating the custody agreement is *res judicata*. We think the doctrine has no application here for several reasons. The child was never within the jurisdiction of the Nevada court.[7] He has lived almost exclusively in the District and was in the control of the Jurneys here when appellant acquired a domicile and obtained her divorce in Nevada. Moreover, the foreign decree does not purport to be an independent adjudication of custody but is merely confirmatory of the agreement.[8]

Reversed and remanded for further proceedings not inconsistent with this opinion.

HOOD, Associate Judge (dissenting).

It appears to me that the reversal of the order of the trial court is based on the proposition that appellant, the natural mother, has a preferential right to custody of her child, and that such right cannot be denied her without a finding that she is presently unfit to have custody. Of course I recognize the preferential right of a natural parent to custody of his or her child, but I believe that in the present case the mother lost that right.

According to the mother's own testimony, when the child was two years old she decided to return to work because of financial problems and because "I felt that a diversion was well in order." The child was placed with the Fredericks and stayed there five or six months. The result was not good for the child. He was nervous and continually under a doctor's care. But, according to the mother, "it was out of the question as far as my quitting my job and staying at home to care for him," so the child was then placed with the Jurneys and left with them for nearly seven years. After the child had been with the Jurneys about three years the parents signed the agreement vesting in the Jurneys "full and absolute right for the care and custody of the child." When the mother obtained her Reno divorce she had this agreement approved and ratified. She then took up her home with her second husband, lived here for about nine months, and then went with him to Europe for two and one-half years. And so it was that she made no demand for custody of her child from January 1951 until October 1957.

Whether we use the word "abandon" or not, I believe the mother's conduct was such that the trial court could properly conclude that the mother was definitely more interested in her own personal life than in the welfare of the child, that she

7. Seeley v. Seeley, 30 App.D.C. 191.

8. See Boone v. Boone, 80 U.S.App.D.C. 152, 155, 150 F.2d 153.

was not willing to make the personal sacrifice necessary for the daily care of her small child, and sought its custody only when it best suited her convenience; and by such conduct the mother had lost her preferential status. Under these circumstances, I do not think the denial of custody to her required a finding that she is presently not a fit person. I think the real question was the child's welfare. The court found that to take the child from the Jurneys and return him to his mother would be "unnecessarily cruel and painful" to the child and that its welfare would be best served by awarding custody to the Jurneys. I think such finding ought not to be disturbed.

In my view the present case is distinguishable from Bell v. Leonard, 102 U.S. App.D.C. 179, 251 F.2d 890, because of the reference in that case to the "mother's persistent efforts to obtain her child." There were no such persistent efforts here. The same applies to the case cited and relied upon in the Bell case, namely, People ex rel. Kropp v. Shepsky, 305 N.Y. 465, 113 N.E.2d 801, where there is the same reference to the mother's "persistent efforts to regain its custody." And I think we should note that in People ex rel. Portnoy v. Strasser, 303 N.Y. 539, 104 N.E.2d 895, 896, also cited and relied upon in the Bell case, the court made the significant statement: "Nor is this a case where a parent has left a child with relatives for a long time, then seeks it back."

Cases involving custody of children place an awful responsibility on the trial judge, and where the case has been fully and fairly heard and a decision reached, I do not believe we should disturb that decision unless it clearly appears that it resulted from an error of law. I see no such error in this case and I would affirm.