### In the Matter of Cecelia LEM.

No. 2604.

Municipal Court of Appeals for the District of Columbia.

Submitted Aug. 22, 1960.

Decided Oct. 14, 1960.

Marjorie McKenzie and Belford V. Lawson, Jr., Washington, D. C., for appellant.

Chester H. Gray, Corp. Counsel, Milton D. Korman, Prin. Asst. Corp. Counsel, Hubert B. Pair and H. Thomas Sisk, Asst. Corp. Counsel, Washington, D. C., for appellee.

Before ROVER, Chief Judge, HOOD, Associate Judge, and CAYTON (Chief Judge, retired) sitting by designation under Code, § 11-776(b).

ROVER, Chief Judge.

The mother of Cecelia Lem, a child born out of wedlock, appeals from an order committing her daughter to the legal custody and guardianship of the Department of Public Welfare until her 21st birthday, and permanently depriving her of custody in order that the Welfare Department may consent to the adoption of the child under the provisions of Code 1951, § 3-117(3).

The child was born January 11, 1956. Paternity has not been established, but it seems from the mother's own statements that the father was a foreign national student who has since returned to his country. For about four months after the birth of the child a private social welfare agency sought to advise the mother as to the best course for her to follow, but she resisted any definite planning other than foster care for the child. At the expiration of four months, and apprehending that long-term planning would be required, the agency referred the case to the Department of Public Welfare. On May 4, 1956, the child came into "emergency care" of the Child Welfare Division of the Welfare Department and was placed in a home for infants.

During the next 14 months the Division sought either to work out a plan whereby the mother would actively assume custody and responsibility for her child, or to persuade her to surrender it for adoption. She cooperated with the Division so long as she was not forced to make a definite decision. When pressed for some definitive action, however, she would state that her psychiatrist had cautioned her about being "rushed" into making a decision, and would become uncommunicative, withdrawn and unavailable.

On July 3, 1957, the Child Welfare Division, pursuant to the provisions of Code 1951, § 11-908, filed a petition in the Juvenile Court charging that the child was without adequate parental care. Code 1951, § 11-906(a) (6). In an accompanying report it related the mother's history of vacillation and indecisiveness concerning the rearing of the child and recommended that the latter be committed to the Department of Public Welfare for three months "in order to give the mother this additional time either to make her decision to release Cecelia for permanent planning or to offer a satisfactory plan of care for her independent of Child Welfare Division." On July 10, 1957, a hearing was held with the mother's court-appointed counsel present; the court found the child was without adequate parental care and committed her to the Department of Public Welfare until October 9, 1957. This period appears to have been inadequate to accomplish its purpose, and the court on November 11, 1957, after a hearing with the mother and counsel present, committed the child to the Welfare Depart-

ment for two years until November 4, 1959. The mother consented to this action.

At the end of the latter commitment period a hearing was again held on November 25, 1959. At that time counsel for the mother indicated it was his intention to ask for more time for his client to formulate her plans. The court replied that it would hear no arguments for further temporary commitment, but would confine the hearing to resolving the issue of permanent custody in the mother or the Welfare Department. Counsel for the mother acquiesced in this ruling and the hearing proceeded on that basis.

The case for the Child Welfare Division was presented by one of its social workers. She testified that during the course of the two-year commitment the child had been placed in a suburban foster home. The mother visited her about once every two months throughout the period. The early visits were made at the foster home, but due to criticism on the part of the mother about the care her daughter was receiving, the foster parents requested that the mother arrange for visits through the Child Welfare Division.

It also appears that during this time the mother was requested to make contributions to the support of the child while under the care of the Division. This she failed to do, her reasons therefor being somewhat obscure, but seemingly based upon a notion that she should not be called upon to support her child if she did not have custody. In addition, according to the witness, the mother still refused to cooperate with the Division in devising a plan for the assumption of responsibility for her child. She refused to allow that agency to contact her relatives regarding the problem, which the agency thought reflected some embarrassment due to the circumstances and it respected her wishes.

The mother herself testified that she loved her daughter very much and had developed a close attachment for her during her visits;

she also expressed concern about the child's welfare. She said she never thought about the possibility that the child would be taken from her, but since that was the course this hearing was taking, she was now willing to assume custody and responsibility for the child rather than lose her permanently.

This was the first time she evidenced any decisiveness in the matter, and thus we have pointed up the fundamental issue in this case—whether her decision has come too late. The child was by then almost four years old and so far as the record indicates, never had been under the care of the mother for any length of time. Since the mother now indicated she was willing to take the child, she was questioned as to her plans regarding its care, a matter which should have been worked out with the Division before the hearing and presented to the court for its acceptance.

In response to these inquiries the mother stated that she was 39 years old, a college graduate, and at the time she lived in an efficiency apartment and was employed as a clerk in an insurance company earning a take-home pay of $55 per week. She said that one reason she refused to contribute to the child's welfare was that she had encountered heavy medical bills in recent months, and she also felt the Welfare Department was taking an unrealistic position in requesting aid from her. Further, she related how she had spent some money on night courses to advance her education and thus improve her position to provide a better home for the child when she did get custody. She admitted she had been under the care of several psychiatrists over the past few years, but did not feel that would impair her ability to care for her child. She said she was now willing to take her child and to do whatever was required to provide a suitable home.

The court had before it together with the foregoing facts the opinion of the Division that adoption was in the best interests of the child, and that the child was fast approaching an age when it would be difficult to

place. At the conclusion of the hearing the court ruled against the mother, and on December 3, 1959, entered the order appealed from. On December 4, 1959, the court denied a motion for rehearing that had been filed in the interim between the date of the hearing and the date of the order.

On December 14, 1959, the mother's attorney filed another motion for rehearing together with affidavits of her psychiatrist and two of her sisters. The court granted this motion and held a hearing on January 12, 1960, limiting the proceedings strictly to the new matter raised by the mother. The psychiatrist testified that while the mother suffered from a personality disorder, it was his opinion that this would not interfere with her ability to care for her child. Only one of the two sisters who submitted affidavits testified at this hearing. She stated that the mother never requested her assistance before, but now that her sister stood to lose her child she had been approached, and was ready to do anything she was able in order that her sister be allowed to keep her child. The affidavit from the second sister was to the same effect. Both these sisters lived out of town and were unmarried. At the close of the testimony the court reaffirmed its order of December 3, 1959, and the mother brings this appeal.

We must first dispose of the jurisdictional problem raised by the Corporation Counsel, who contends that this appeal was not timely filed. His position is that the appeal is from the order of December 3, 1959, and being thus filed on January 22, 1960, was beyond the ten-day appeal period and must be dismissed. Rule 27(c, q), Municipal Court of Appeal Rules. To support that theory the Government states that the motion for rehearing filed on December 14, 1959, subsequent to that denied on December 4 was merely a successive motion and did not act to stay the period in which to appeal. Randolph v. Randolph, 91 U.S.App.D.C. 170, 198 F.2d 956; Defoe v. National Capital Bank, D.C.Mun.App., 97 A.2d 464. Nor is it of any avail to the mother, it is argued, that

the court entertained the motion of December 14, because that motion was essentially a motion for a new trial and the five-day period in which the Juvenile Court had to grant such a motion had already expired, so that the court was without jurisdiction to act as it did. Rule 12B, Juvenile Court Rules.

■ We do not think the jurisdictional issue raised by the Government is meritorious. Our Code specifically provides that when there is proper original jurisdiction, the Juvenile Court shall have continuing jurisdiction over children committed by it during their minority. Code 1951, § 11–907 (Supp. VIII). Pursuant to this power the court also has the concomitant right to modify or revoke its orders "from time to time" upon petition of certain interested persons, who may file an application therefor "at any time." Code 1951, § 11–916. Admittedly, continuing jurisdiction is usually exercised over children committed as juvenile delinquents or offenders. But our Code makes no distinction between that type of commitment and the type present in this case, which stems from neglect on the part of the child's natural parent. We feel that Congress, realizing that the needs and welfare of a child committed under any conditions fluctuate rapidly, intended that the court have continuing jurisdiction in all child commitment cases in which it had original jurisdiction.

■ We further feel that the court properly exercised its continuing jurisdiction in this case. The mother's motion presented new material for the court's consideration which had not been before it previously. The court had the duty to view all the evidence with the best interests of the child as its guide to an ultimate determination; consequently, it had wide discretion in assessing what would constitute sufficient reason to reopen the case for additional testimony, i. e., to exercise its continuing jurisdiction. If the new matter had convinced the court that the welfare of the child would best be served by placing

custody in its mother, no one could doubt, in view of the statute, that it would have been a valid order. Because the court refused to amend its order of December 3 it does not follow, as the Government suggests, that the time in which to appeal commenced to run as of that date. Rather, the time in which to appeal commences to run anew each time the court exercises its continuing jurisdiction and renders what is up to that point, barring the granting of a new petition by an interested party, a final order.[1]

■■■ From our standpoint, the fact that the Juvenile Court does have the power of continuing jurisdiction does not bar the right of appeal. If the order appealed from is intended to be a final order and would adjudicate the rights of the parties with finality if effectuated, we feel that it is none the less appealable because the party aggrieved could petition the Juvenile Court to exercise its continuing jurisdiction under certain conditions. All that we require is that the party aggrieved appeal within the time allowed from the order which purports to be final.

■■ Returning to the merits of this controversy, the primary contentions of the mother on appeal are that the action of the court in permanently depriving her of the custody of her child and awarding it to the Welfare Department was not justified by the evidence, and that the ruling was arbitrary and an abuse of discretion. No attack is made on the court's statutory power to act as it did, and indeed none could be sustained in view of the court's plenary power in this area.

Concerning the weight of the evidence, we feel that the facts summarized indicate beyond doubt that the child was without adequate parental care. No reasonable mind could question the proposition that a child

deprived of the care and attention of its natural mother and committed to the care of welfare agencies for the first four years of its life is a neglected child within the meaning of the statute. We think the evidence was completely adequate to sustain the court's finding.

Nor do we think that it was an abuse of discretion on the part of the court to fail to award custody to the mother based on her newly asserted willingness to take the child at the time of the last hearings. It is true that the fitness of a parent at the time of the hearing is the controlling factor in the determination of custody rights, and that past conduct of a parent is but an aid in arriving at the parent's present qualifications.[2] But the court fully satisfied this test by having the mother relate at the time of the hearing her present mode of living and how she intended to care for the child if it were awarded to her. Her answers revealed vague and uncertain generalities behind the declared willingness to accept the child; the court clearly could not have given her the child at that time, and it was entitled to conclude from the mother's past history that further temporary commitment would merely mean further procrastination and delay.

We can well sympathize with the mother in the unfortunate situation in which she finds herself; but in this case she was given expert guidance and counseling by trained social workers. She had every opportunity over a four-year period to formulate plans for the rearing of her child before the court took the action of which she complains. We can appreciate that under the circumstances it was very difficult for her to arrive at a decision in the matter but we feel that once the situation had deteriorated to the point of requiring judicial determination she must have been apprised, having been represented by counsel, of the conse-

1. See In re Ramelow, 3 Ill.App.2d 190, 121 N.E.2d 41; Pettit v. Engelking, Tex. Civ.App., 260 S.W.2d 613; 31 Am.Jur., Juvenile Courts, §§ 31, 85.

2. Bell v. Leonard, 102 U.S.App.D.C. 179, 251 F.2d 890; Davis v. Jurney, D.C.Mun. App., 145 A.2d 846.

quences of the failure to utilize the ample time allowed to decide to make definite plans for taking the child.

▆ We feel the record supports the disposition made by the court. This jurisdiction has long followed the rule that the determination of child custody "is one largely, and it may be said almost exclusively, of judicial discretion, and that discretion is never reviewed by an appellate court, except when such discretion has been manifestly abused."[3] This case does not present such an abuse, and we have no right to substitute our judgment for that of the trial court.

Affirmed.

3. Wells v. Wells, 11 App.D.C. 392, 394, quoted with approval in Steele v. Steele, 83 U.S. App.D.C. 254, 168 F.2d 562.