In the Matter of declaring MARJORIE MAY PHELPS
and ROBERT KENYON PHELPS neglected children.

No. 10823.

Submitted May 18, 1965. Decided June 8, 1965.

402 P.2d 593.

F. F. Haynes, Forsyth, Martin & Young, Arthur B. Martin (argued), Baker, for appellant.

Bruce M. Shelden (argued), Ekalaka, Gene Huntley (argued), Baker, for respondent.

MR. CHIEF JUSTICE JAMES T. HARRISON delivered the Opinion of the Court.

This is an appeal by the adoptive parents of two minor

children, a boy aged eleven years and a girl aged four years at the time of the proceedings, from a judgment entered in the district court of Carter County which adjudged the two children to be dependent and neglected and awarded their custody, care and control to the State Department of Public Welfare, pending a further determination as to the agency or institution to which the children would be committed permanently, and ordered the adoptive parents to pay $50 per month for the support of the children.

The assignments of error specified by the appellants resolve into two basic issues, first, is the evidence sufficient to support a judgment that both children are dependent and neglected; secondly, if so, is it sufficient to support a judgment permanently depriving the adoptive parents of both children and requiring them to pay $50 per month for their support?

The appellants received custody of the children in 1959 and formally adopted them in February of 1960. In November of 1962 the supervisor of the county welfare department filed a petition to have the children declared neglected children and awarded to the care, custody and control of the welfare department. Pursuant to the petition a citation was issued setting the hearing for December 12, 1962; the hearing was not completed on that date and was continued to a further hearing which was held on May 27, 1963, at which time the hearing was not completed and it was again continued to July 24, 1963, on which date the hearing was concluded. The judgment was entered on November 26, 1963.

We do not feel any purpose would be served by an extended discussion of the evidence before the court. The State produced a number of neighbors and others living in the vicinity who testified to acts of mistreatment of the boy, consisting of severe whippings, beatings, and general slapping around to the extent that blood had been drawn thereby, and in general such evidence disclosed that the boy had many times appeared bruised about the face and body. The condition the boy was

in at the time these proceedings were instituted can best be described by quoting from the testimony of a doctor who examined him on November 15, 1962. The Doctor described his outward physical findings in these words:

"The findings that was marked—that was rather obvious was that he had dozens of large scars over his back and the back of his legs there were scars that were white and obviously had been deep enough to cut through all the skin layers and most of them were old but there were probably a dozen that were recent, probably anywhere from three to seven days old. He had some bruise marks on his lower legs and I was just trying to remember whether he had any on his arm but he had two odd looking areas on the back of two fingers that were wounds, they were sort of like burned areas, they were healing wounds but they were round and they were beginning to heal but there had been inflammation in them. As I say, they were odd appearing, I don't know what really caused them. He also had numerous gouge marks on his face and to some extent, the right ear. Some of these were recent, within the last three to seven days, I would estimate, and the rest of them were old. His general health was good. He was well nourished, except for these—did I mention the bruised areas on his legs?

"Q. I don't think so. A. Both legs had some bruises on them, large enough, at least two inches or more in length. His right ear also had some healing wounds on it, the skin type superficial wounds.

"Q. Did you—I don't think you did. How large were these scars on his back? A. I wrote that down here. These scars on the back were from one and a half to one inch long and one-fourth to one-eighth of an inch wide.

"Q. Did you count the number of them? A. I did not. It would have taken a long time to count them. There were dozens, I would say in the dozens.

"Q. Did these scars extend to some other area of his body besides his back? A. Well, on the back buttocks to a lesser

extent, a few on the back of the legs but I don't recall except on his face and ear any other particular scarred areas that amounted to very much.

"Q. Some of these wounds had healed completely, is that correct? A. Oh, yes, some of them were real old, a matter of six months or a year, the centers were white as you would see in an old scar.

"Q. Some of them were in the process of healing? A. Some of them were in the process of healing. There were some recent ones.

"Q. By recent you mean scabbed over? A. Scabs on them, yes, that's right.

"Q. Now, what type of marks did he have on his face? Were they different from the other marks? A. They—I would say were scooped out gouge-type marks.

"Q. Were they of a deep enough gouge to leave a permanent mark or scar? A. I believe so. Some of them were so old that the scar that was left I would estimate to be a permanent scar, maybe not real obvious. I think if you looked at him very carefully you would be able to see them today.

"Q. Based upon your experience in the field of medicine and your observations of this case, Doctor, do you have an opinion as to what caused those marks on his face? * * * A. 1 believe that they would be comparable with finger scratch marks, not scratch marks, gouge marks. I have a particular reason for believing that although at the time I thought the same thing but some weeks later some patient came in with a child with a similar mark. I asked the mother how it happened and she said another child had gouged him out with a fingernail and it was an identical appearing mark.

"Q. And these gouge marks on the face which you speak had gouged through the skin layer sufficiently to leave a permanent scar? A. They had gone through, probably in all the skin layers but into some of the deeper layers enough to promote scars that were obviously months old.

"Q. Now, were some of these scars on the face fresher than others? A. They were. Some of them were probably three to seven days old."

There was evidence that in 1959 before the boy went to the home of appellants he had no scars or wounds upon his body, no marks on him of any significance.

On behalf of appellants several neighbors testified that they had never observed any marks, bruises or scars upon the boy. The appellants denied the assertions of the State's witnesses and explained each incident of mistreatment which had been testified to. Neither the trial court nor we can accept such explanations as true in view of the physical condition apparent on the youngster. Suffice it to say that we have carefully reviewed the record and in our opinion the evidence is sufficient to support the judgment of the court.

Appellants vigorously contend that there is a complete absence of any evidence of mistreatment as to the little girl and that in finding her to be dependent and neglected the court erred.

Section 10-501, R.C.M.1947, provides in relevant part:

"*Dependent and neglected children—definition.* For the purpose of this act, the words 'dependent child' or 'neglected child' shall mean any child of the age of sixteen years, or under that age, * * * who has no proper parental care * * * or whose home, by reason of neglect, cruelty, or depravity on the part of its parents * * * is an unfit place for such child, or whose environment is such as to warrant the state, in the interest of the child, to assume its guardianship or support."

The question to be resolved in this case was whether or not the adoptive parents were fit and proper parents and since we concur with the trial judge that they are not, we concur in his actions with respect to the little girl.

Turning to the issue as to the court's judgment that the appellants pay $50 per month for the support of the children: appellants contend that the requirements of sections 10-506 and

10-507, R.C.M.1947, were not complied with. In brief these sections of our Code require an investigation by the county welfare board for the purpose of ascertaining the financial ability of the parents to pay the cost of taking care of the children in a foster home or the Montana Children's Center, and the filing of a written report of the investigation with the court before the time fixed for the hearing; that upon the hearing the court may hear evidence regarding the financial ability of the parents and may take into consideration the report of the investigation. If the court finds and determines that the parents are financially able to pay a part or the whole of the costs, such child shall be ordered placed in the Montana Children's Center or a foster home, and the court shall make an order requiring the parents to pay such amount as the court may deem proper.

From the record it appears that the county welfare board directed a letter to the district judge on December 11, 1962, filed December 12, 1962, wherein it stated:

"A financial report is not being submitted at this time, as it is understood that such information will be forthcoming through testimony at the hearing to be held on December 12th, 1962 at the Carter County Court House in Ekalaka, Montana."

We do not find any testimony from the State disclosing the financial ability of the parents. The adoptive father did testify as to what he considered his ranch to be worth. In any event the statute requires a written report to be filed before the hearing. Then, too, the children were not ordered placed in the Montana Children's Center or a foster home, the judgment providing for a further determination as to the agency or institution to which the children would be committed permanently. For these reasons the judgment of the court should be modified by striking therefrom the provision ordering the adoptive parents to pay $50 per month for the support of the children.

As so modified the judgment is affirmed.

MR. JUSTICES JOHN C. HARRISON, ADAIR, DOYLE and CASTLES concur.