581 A.2d 771 (1990)
In re S.G., B.G., Appellant.
In re A.B., K.B., S.G., and R.B., J.B., Appellant.
Nos. 88-236, 88-228 to 88-231.
District of Columbia Court of Appeals.
Argued January 25, 1990.
Decided October 26, 1990.
*773 Beth Goodman, appointed by this court, for appellant B.G.
Sumner J. Katz, appointed by this court, for appellant J.B.
Linda A. Caruso, appointed by this court, for appellees A.B., K.B., S.G. and R.B.
Mary L. Wilson, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for appellee District of Columbia.
Before ROGERS, Chief Judge, FERREN and SCHWELB, Associate Judges.
SCHWELB, Associate Judge:

I

THE PROCEEDINGS
This is not a pleasant case. The consolidated appeals before us are from the trial court's disposition of a child neglect proceeding which had its inception in the repeated sexual abuse of S.G., now twelve years of age, by her stepfather, J.B.[1] The abuse began in the spring of 1986, when S.G. was seven years old, and continued at intervals[2] until July 1987. S.G.'s complaints to her mother did not resolve the situation, and she eventually related her experiences to an adult friend, who urged the mother to take some steps to protect her daughter. The mother then called Children's Hospital and agreed to come to the hospital to make a report. When the mother failed to keep her appointment, representatives of the hospital notified the police.
In August 1987, as a result of the police investigation of the charges, the Corporation Counsel filed a petition pursuant to D.C.Code §§ 16-2301, -2320 (1989) alleging that S.G. was a neglected child. Both S.G.'s stepfather and her mother were alleged to have participated in the neglect, the former actively, the latter passively. Specifically, the government claimed that S.G.'s stepfather had taken certain "indecent, improper and immoral liberties" with her, and that her mother had failed to protect her from the stepfather's abusive conduct.
The government also filed separate neglect petitions with regard to S.G.'s three younger half-siblings (A.B., K.B., and R.B.). These three childrena boy of six and two girls, both under twowere all born of the union of S.G.'s mother and her *774 stepfather. The government alleged that each of the younger children was neglected because, in light of the abuse of S.G., he or she was in "imminent danger of being abused" by his or her father (S.G.'s stepfather) within the meaning of D.C.Code § 16-2301(9)(E) (1989).
Following an evidentiary "factfinding" hearing, the trial judge found that the stepfather had sexually abused S.G. several times by touching her vagina with his hand and, on one occasion, by inducing her to perform oral sodomy on him.[3] The judge held that S.G. and the three other youngsters were neglected children, and specifically found that the younger three were in imminent danger of abuse. The judge concluded, however, that the mother's conduct "did not rise to the level of neglect or abuse." Subsequently, at the disposition hearing, the judge held that it would be in the best interest of all four children to be placed in the custody of A.A., their maternal grandmother. He then entered an order directing such placement for an indeterminate period not to exceed two years.
The foregoing disposition has resulted in appeals to this court by S.G.'s stepfather, J.B., and by her natural father, B.G. The stepfather contends that the evidence was insufficient to show that he abused S.G., that the trial judge should have granted his motion for a severance and should have tried the allegations against him separately from the allegations against the mother, and that there was inadequate support in the record for the judge's finding that S.G.'s young half-siblingsthe stepfather's own childrenwere in imminent danger of abuse. S.G.'s natural father, B.G., contends that he was wrongfully denied custody of S.G. and that the trial court's order was not authorized by law. Finding the contentions of both appellants unpersuasive, we affirm the judgment of the trial court in all respects.

II

THE STEPFATHER'S APPEAL

A. Sufficiency of the evidence of abuse.
The stepfather claims that the evidence at the factfinding hearing was insufficient to support the judge's finding that he had abused S.G. He contends that S.G. was not consistent in her accounts of the alleged abuse, that the government offered no physical corroboration of her testimony, and that her good grades and normal behavior during the period in question were incompatible with the notion that she was being sexually abused.
This contention need not detain us long. In cases tried by the judge without a jury, the scope of our review is circumscribed by D.C.Code § 17-305(a) (1989), which provides that the judgment may not be set aside except for errors of law unless it is "plainly wrong or without evidence to support it." As we recently noted in In re T.M., 577 A.2d 1149, 1151 (D.C.1990), a juvenile delinquency proceeding in which guilt was required to be proved beyond a reasonable doubt rather than, as here, by the lesser standard of preponderance of the evidence,[4]
[i]n evaluating appellants' claim of evidentiary insufficiency, we must consider the evidence in the light most favorable to the government, giving full play to the right of the judge, as the trier of fact, to determine credibility, weigh the evidence, and draw reasonable inferences.... The government is entitled to the benefit of all reasonable inferences from the evidence, nor may any distinction be drawn between direct and circumstantial evidence.
[Citations omitted].
The trial judge presided over the factfinding hearing and was able to observe and assess the demeanor of the witnesses. This court, on the other hand, is limited to a paper record which may capture the words of a case but not its heart and soul. *775 In re T.M., supra, 577 A.2d at 1154. "An appellate court will not redetermine the credibility of witnesses where, as here, the trial court had the opportunity to observe their demeanor and form a conclusion." WSM, Inc. v. Hilton, 724 F.2d 1320, 1328 (8th Cir.1984). The judge expressly credited S.G.'s testimony, despite some inconsistencies in it, specifically alluding to her candor in declining to exaggerate when the opportunity arose. The judge also made it clear that he disbelieved the testimony of her stepfather. This court may not usurp the prerogative of the judge, as the trier of fact, to determine credibility and weigh the evidence. Irick v. United States, 565 A.2d 26, 30 (D.C.1989). Were we to second-guess the trial judge's determination that, with respect to the critical facts, S.G. was worthy of belief and her stepfather was not, we would be engaging in the very usurpation which § 17-305(a) and our precedents proscribe.

B. The denial of the stepfather's motion for severance.
The stepfather contended below, and now reiterates on appeal, that the allegations against him should have been tried separately from those against the mother. He argues as follows:
Severance was required to ensure a fair trial for the appellant. He was charged with abusing his step-daughter. The mother, C.B., was charged with failure to protect. From the petition and complaint, it was obvious that the evidence in regard to the mother would involve what she had been told, when she had been informed of possible incidents, and what she had done in response to that information. It was also clear that whatever evidence was to be brought against the mother could contain a great deal of material that was inadmissible as against the father, but highly prejudicial to his defense. Much of it would be emotional and inflammatory, given the nature of the charges. The opportunity for the father to have a fair trial under such circumstances would be heavily compromised.
The trial itself was proof of appellant's worst fears about a joint trial. More than three-fourths of the trial involved the Government's efforts to prove the charges against the mother, most of it as expected with emotionally-charged evidence that was not admissible as evidence against the father.
Noting that the proceedings involved serious charges against him and implicated fundamental liberty interests, the stepfather argues that "guidance from and reference to criminal law procedures seems appropriate." Neglect proceedings are remedial and focus on the child; they are critically different from criminal prosecutions, which are primarily concerned with the allegedly abusive parent. See In re S.K., 564 A.2d 1382, 1388-89 (D.C.1989). Nevertheless, we agree that in the area of joinder and severance, precedents in criminal cases can provide us with some guidance.[5] We are satisfied, in any event, that the trial judge acted well within his discretion in denying the stepfather's motion for a severance.
If the stepfather and mother had been criminally prosecuted on the basis of the facts adduced at trial, the offenses would have been properly joined. The allegations that the stepfather abused S.G. and that the mother failed to prevent the abuse plainly mean that the two are accused of "participat[ing] in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses" within the meaning of D.C.Code § 23-111(a) (1989) and Super.Ct.Crim.R. 8(b). The only substantive question, were this a criminal case, would be whether the trial judge abused his discretion by denying the stepfather's motion for a severance. See D.C.Code § 23-113 (1989) and Super. Ct.Crim.R. 14.
*776 Since the charges against the stepfather and the mother were properly joined, there is a strong presumption that, even in a criminal proceeding, they would be tried together. King v. United States, 550 A.2d 348, 352 (D.C.1988). "[J]oinder serves to expedite the administration of justice, reduce congestion of trial dockets, conserve judicial time ... and avoid the necessity of recalling witnesses who would otherwise be called upon to testify only once." Jennings v. United States, 431 A.2d 552, 556 (D.C.1981), cert. denied, 457 U.S. 1135, 102 S.Ct. 2964, 73 L.Ed.2d 1353 (1982). Moreover, "the trial judge has wide latitude in determining whether to grant or deny a motion for severance of defendants, and our review is limited to a determination whether his discretion was abused." King, supra, 550 A.2d at 352.
In the present case, the granting of the stepfather's motion for a severance would not only have contributed to court congestion and inconvenienced counsel and witnesses, but would have required S.G., a child not yet in her teens, to testify for a second time about the painful and humiliating experiences which gave rise to this unfortunate case. This would surely have added, unnecessarily and impermissibly, to the distress which S.G. had already suffered. As the Supreme Court recently reiterated in Maryland v. Craig, ___ U.S. ___, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), the public interest in protecting minor victims of sex crimes from further trauma and embarrassment is a compelling one. The Court held in that case that what it described as the State's transcendent interest in protecting the welfare of children, id. at ___, 110 S.Ct. at 3170,[6] which finds support in "the growing body of academic literature documenting the psychological trauma suffered by child abuse victims who must testify in court," id., may outweigh even the defendant's right under the Confrontation Clause of the Sixth Amendment to face his accuser in the courtroom. If the protection of a child from a single face-to-face confrontation with the alleged abuser is such a compelling consideration that it warrants a constricted reading of an express constitutional guarantee, then the trial judge surely acted within his broad discretion when he denied the motion for separate trials here and declined to require S.G. to testify twice.
Moreover, as we stated in Winestock v. United States, 429 A.2d 519, 527 (D.C. 1981),
[i]n order to establish that the trial judge has abused his discretion in denying him a severance, a defendant must show the most compelling prejudice.
(Citation and internal quotation marks omitted.) There is no basis for such a finding of prejudice in this case. There was no jury. We recently observed in Nolan v. Nolan, 568 A.2d 479, 488 (D.C.1990), that this court has often acknowledged the ability of trial judges to separate admissible from inadmissible evidence in rendering judgment on the merits. As we stated in In re L.J.W., 370 A.2d 1333, 1336 (D.C. 1977), a juvenile delinquency case,
[t]his court has recognized the `presumption that a trial court will disregard all irrelevant matters in making its adjudications.' In re W.N.W., D.C.App., 343 A.2d 55, 58 (1975). Where, as here, the evidence presented is admissible for one purpose (admission of co-respondent) but not admissible for another purpose (implicating appellant in the crime), "[t]he judge will be presumed to have disregarded the inadmissible and relied on the competent evidence." McCORMICK ON EVIDENCE § 60, at 137 (2d ed. 1972).[7]
*777 There is no evidence here that the trial judge was unable, in evaluating the case against the stepfather, to restrict his consideration to evidence admissible against him. Indeed, in admitting the testimony of several government witnesses to the effect that the mother acknowledged to them that she knew of some incidents of abuse, the judge expressly stated that this testimony would not be considered as substantive evidence against the stepfather. Accordingly, there being no showing of prejudice, we are not prepared to hold that the judge abused his discretion.

C. The sufficiency of the evidence with respect to the younger children.
In his initial written decision in this case, the trial judge concluded that
the other three respondents are neglected in that their sibling, [S.G.], was abused by their father, Mr. [B]; and that under all the circumstances of that abuseand its repetitionthe other three respondents are in imminent danger of similar abuse.
Counsel for the stepfather contended on appeal that this finding[8] was insufficiently detailed and, following oral argument, this court remanded the record to the trial court and directed the judge to elaborate upon the basis for his finding of imminent danger. In response to our order, the judge made supplemental findings which included the following:
[The stepfather's] abuse of [S.G.] occurred repeatedly over a period of more than a year. It was not an isolated or impulsive incident but rather consisted of a pattern of conduct posing a continuing risk to those who are vulnerable and within the range of danger from such conduct.
On at least two occasions, in January of 1987 and in July of 1987, [S.G.] was molested by [the stepfather] while his youngest child, A.B., was in the same room, and on the latter occasion while another child (a visiting friend of [S.G.'s]) was in the same bed. The stepfather thereby demonstrated inability or unwillingness to shelter other children, including his own, from such conduct.
The three younger children are respectively six and half years old, eighteen months old and eight months old, and are thus even less capable of protecting themselves than [S.G.] was at the time of the abuse inflicted upon her.
The judge also alluded, albeit rather obliquely, to the stepfather's "continuous alcohol abuse, violence, and lapses of memory *778 after drinking."[9] This reference to the stepfather's drinking problem was fully supported by the record. S.G. testified that the stepfather drank frequently and was always drunk when he abused her. The mother related that her husband drank continuously, usually beginning before breakfast, and that drinking sometimes made him violent, caused him to fall asleep, and led him to forget events that had occurred.
The term "neglected child" is defined in our statute as including a child "who is in imminent danger of being abused and whose sibling[10] has been abused." D.C. Code § 16-2301(9)(E). The plain language of this provision requires the government, when it seeks to invoke this definition, to establish both the abuse of the sibling and imminent danger to the child before a finding of neglect may be made. The statute is thus incompatible with any notion that abuse of one sibling, per se, constitutes neglect of another.
In the present case, the government has not alleged any direct abuse of the three younger children, but relies solely on the abuse of S.G. and the surrounding circumstances. The issue now before us is whether there was a sufficient evidentiary basis for the judge's finding that these children were in imminent danger of mistreatment.
This question is not an easy one. S.G.'s stepfather is the natural father of the three younger children. He is not alleged to have abused them. They were removed from his custody solely on the basis of his conduct vis-a-vis S.G., who was his step-daughter, not his own child.
The primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition. In re S.K., supra, 564 A.2d at 1390; see Wisconsin v. Yoder, 406 U.S. 205, 232, 92 S.Ct. 1526, 1541, 32 L.Ed.2d 15 (1972). "The fundamental liberty interest of natural parents in the care, custody and management of their child does not evaporate simply because they have not been model parents...." Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); accord, In re N.H., 569 A.2d 1179, 1181-82 (D.C. 1990). Important as these considerations are, however, we have held that in a civil proceeding predicated on alleged child neglect or abuse, the best interest of the child is the paramount consideration. In re S.K., supra, 564 A.2d at 1388. Neglect statutes authorizing state intervention on a child's behalf are remedial, and they should be liberally construed to enable the court to carry out its obligations as parens patriae. Id.; see also In re O.L., No. 89-229, slip op. at 8 (D.C. July 10, 1990).
Although the precise issue here presented does not appear to have been previously addressed by this court,[11] a substantial number of decisions in other jurisdictions support the proposition that a trial judge may legitimately find, on the basis of a parent's abusive conduct towards one child, that the child's siblings are also in danger of abuse and should be removed from the home for their own safety. Appellate decisions *779 so holding include In re Christina Maria C., 89 A.D.2d 855, 857, 453 N.Y.S.2d 33, 34 (2d Dept.1982) (brutal treatment of seven-year-old boy warranted finding that one-year-old half-sister was likewise in "imminent danger of excessive corporal punishment and should be removed from home"); In re Edward C., 126 Cal.App.3d 193, 203, 178 Cal.Rptr. 694, 700 (1981) (physical abuse of an eight-year-old girl, Marlee, created unacceptable danger for her brothers, aged nine and six, because "the court could reasonably infer that the father, with Marlee removed, would substitute either one or both of the boys as an object of his ruthless drive for religious protection"); In re K.D.E., 210 N.W.2d 907, 910 (S.D.1973) (court sustained extreme remedy of termination of parental rights as to brother and sister,[12] though only brother had been physically abused, holding that "[w]here the trial court has determined that neglect or abuse exists in regard to one child, it is within its discretion to determine the likelihood of abuse of other children in the same family"); In re State ex rel. Thaxton, 220 So.2d 184, 188 (La.1969) (mother's brutal treatment of three-year-old son warranted protective action by the court over younger child as well; the court noted that placement outside home was not necessarily permanent, for "custody is always reviewable in matters such as this"); In re Phelps, 145 Mont. 557, 402 P.2d 593, 595 (1965) (adoptive parents' physical mistreatment of eleven-year-old boy warranted removal from home of four-year-old girl, where statute authorized such intervention where home was unfit for child by reason of neglect, cruelty or depravity of parents).
Several decisions by various trial courts also support the approach taken by the trial judge in the present case. In In re Katherine C., 122 Misc.2d 276, 471 N.Y. S.2d 216 (1984), for example, a stepfather had sexually abused a ten-year-old girl over a substantial period, eventually impregnating her at the age of twelve or thirteen. Her mother had failed to prevent the abuse, apparently because she never became aware of it. The court found that the girl's two brothers were also neglected children even though there was no evidence of injury to them. The court explained that the parents' "faulty understanding of the duties of parenthood" created a "substantial risk that the children's mental, emotional and physical condition is in imminent danger of becoming impaired." Id. at 282, 471 N.Y.S.2d at 221.
In In re Baby Boy Santos, 71 Misc.2d 789, 336 N.Y.S.2d 817 (1972), a neglect petition had been filed on behalf of a five-day-old boy following the brutal abuse of his 1½-year-old half-sister (who was only eight months old at the time of that abuse). In holding that the boy would be likely to suffer serious harm if placed in the parents' household, the judge wrote that it had been her own experience,
as well as [the experience of] authorities in the subject of child abuse, that there is in effect a `child abuse syndrome' and that when one abused child is removed from the home, that another child in the home may become the object of abuse by the parent (Dr. Ray E. Helfer, "The Battered Child", Univ.Press 1968), Matter of Abeena H., 64 Misc.2d 965, 316 N.Y.S.2d 16 [1970].
Id. 71 Misc.2d at 791, 336 N.Y.S.2d at 819.[13]
In In re J., 71 Misc.2d 47, 335 N.Y.S.2d 815 (1972), the court found that a newborn baby girl was likely to suffer serious harm if placed in the home in which her two sisters had previously been abused. Acknowledging that there was not a "scintilla of evidence" that the parents had harmed the youngest child, who had indeed never been in their custody, the court reasoned as follows:
Experience has shown that a parent who abuses one of his children is likely to abuse his other children. This has become a rule of evidence in child protective *780 proceedings. Accordingly, when an abused child has been removed by a Family Court order from its parents, a social welfare worker or other proper petitioner may file a neglect petition against such parent for the removal of his other children, alleging that such parent is likely to abuse them too. Such petition will not be dismissed as legally insufficient.
* * * * * *
In child protective proceedings, by logical extension of the doctrine, it is also the function of the trial court to determine not only whether neglect or far more serious child abuse exists, but that it is likely to exist. The court sitting as parens patriae cannot be limited in this type of proceeding to conditions already existing or which have happened in the past. Indeed, this court could not be fulfilling its proper function if it limited its necessary broad sweeping horizon of child health, safety and welfare to the past and present situation only when the warning flags from the storms of neglect are still flying and, to borrow a familiar saying from another branch of the law, there is abundant evidence of a "clear and present danger" to children. Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 [1919].
Id. 71 Misc.2d at 791, 335 N.Y.S.2d at 819-20 (emphasis in original).
In the present case, the trial judge has found that the sexual abuse of S.G. continued for a substantial period. On two occasions, one of the younger children was present.[14] According to the judge, the stepfather lied about the abuse. His conduct while intoxicated was violent and unpredictable. The judge was in the courtroom and could assess first-hand whether the man before him was a danger to his children; our own vantage point is a great deal more remote. To be sure, one might plausibly argue that, if the stepfather did not abuse his own children before the discovery of his misconduct vis-a-vis S.G., there was no "imminent danger" that he would abuse them thereafter, but this is a permissible rather than a mandatory inference for the trier of fact. Given all of the circumstances and our limited scope of review, see pp. 774-775, supra, we are not prepared to second-guess the trial judge on a very difficult call.
The stepfather argues in his supplemental brief that he was permitted to have supervised visits with the three younger children while the case was pending, that nothing untoward occurred, and that these events are incompatible with a finding that he represented an "imminent danger" to the children. Subsequently, the father was given supervised visitation rights with his own three children (though not with S.G.) in the trial judge's disposition order, provided that he participated in psychotherapy and in an alcohol treatment program. We think that the judge exercised his discretion judiciously in setting these conditions, and in attempting to maintain a relationship between the three younger children and their father. His authorization of such contacts, as well as the similarly non-punitive approach by the social workers, were altogether consistent with the finding of neglect. That constructive and humane remedial steps were taken does not detract from the seriousness or imminence of the initial danger.
As the Supreme Court of Louisiana stated in Thaxton, supra, 220 So.2d at 188, "permanent custody of these children is not [necessarily] forever barred to respondent." In In re Edwards, 70 Misc.2d 858, 863, 335 N.Y.S.2d 575, 582 (1972), the court, in ordering the removal of an abused child and his brother from their parents' home, expressed the hope that there could eventually be "a joyful reunion of children with the parents.... The walls that are laid in darkness may laugh to the kiss of the sun." The trial court retains jurisdiction of the present case and is in a position to reunite the three younger children with their father or mother or both if it is found to be *781 consistent with the children's best interest for such a step to be taken. Our affirmance of the order on appeal does not restrict the trial court's discretion as to any future steps in this regard.[15]

III

THE FATHER'S APPEAL
The father appeals only from the trial judge's award of custody of his own daughter, S.G., to her maternal grandmother rather than to himself. He contends that the judge lacked authority to place S.G. with a non-parent in the absence of a finding of abuse or neglect on the part of either parent. He also maintains that the trial judge denied him fundamental parental rights protected by the Constitution and by our decisional law, in that he failed to give due consideration to the presumption that his daughter's best interest would be served by placing her with a fit parent rather than with a non-parent.
We agree with the father that a child's best interest is presumptively served by being with a parent, provided that the parent is not abusive or otherwise unfit. We assume, without deciding, that this presumptive preference for a parent over a non-parent applies to a temporary placement of an abused or neglected child pursuant to D.C.Code § 16-2320 (1989). The judge, however, found by clear and convincing evidence that it would be in S.G.'s best interest, and in conformity with her wishes, to live with her grandmother, brother, and sisters in Washington, D.C. where she had spent all of her life, rather than with her father in Norfolk, Virginia in totally unfamiliar surroundings. That finding is supported by substantial evidence, and we hold that the presumption in the father's favor has therefore been effectively rebutted.

A. The nature of the father's participation in the proceedings.
On August 24, 1987, following the filing of the petition in which the mother and stepfather were charged with neglect, Judge Truman Morrison appointed counsel for the mother, father[16] and stepfather. At the initial hearing, the father who is a member of the armed forces and who lives in Norfolk, Virginia, was not present, for he had received notice of the proceeding *782 only on the preceding evening. His counsel stated, however, that the father would eventually like S.G. to come to live with him in Norfolk, but was not ready to take her immediately, since he was about to get married.
At trial, S.G.'s father supported the government's position on the merits against both the mother and the stepfather. Although the father did not introduce any evidence, his attorney cross-examined defense witnesses and attempted to bolster the government's case. During closing argument, counsel for the father urged the court to rule that both the mother and the stepfather had neglected S.G.
At the conclusion of the hearing, the judge initially stated that since S.G. was in her mother's custody (although physically residing with her grandmother), he would simply set appropriate restrictions on the stepfather's contact with S.G. Citing the mother's cocaine addiction, however, the social worker recommended that all four children be placed with the grandmother. The father objected to this proposed placement of S.G. because he was "ready, willing, and able to care for her." He maintained through counsel that the court had improperly denied him custody of his own child during the pendency of the case by ordering that S.G. be placed with the grandmother in the absence of any allegation that he (the father) had acted wrongfully toward S.G. Counsel argued that the court had no authority to remove S.G. from the custody of her natural parents when neither parent had abused the child. She suggested that custody issues be resolved by the Domestic Relations Branch [of the Family Division], but acknowledged that the father had not filed a petition for custody in that Branch. The judge ordered that the children remain with the grandmother pending disposition, but indicated that this interim placement was without prejudice to any application by the father which his counsel deemed appropriate.
The father did not personally appear at the disposition hearing. His attorney, however, made the following request to the court:
I do not know if Your Honor is inclined to make a placement decision with regard to S.G. If your Honor is so inclined, I would ask for sort of an unusual order, in that [the court] allow [the father] to maintain some type of custody. [The father] called me last night and requested, for example, that there be some sort of joint custody [of] the child, who resides at the grandmother's. And the reason for this is, at least [the father's] understanding is, if he does not have some sort of joint custody, S.G. will lose all of her military benefits.
The father's counsel maintained that, if her client were denied custody, S.G. would no longer be eligible to shop at the PX or to obtain free medical care at area army bases, and that she would lose her entitlement to receive health benefits pursuant to the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS). See 32 C.F.R. § 199.1(a) (1989). Counsel continued as follows:
I would also just point out that the home study has yet to be done on [the father], although we are at this point trying to work out some amenable resolution of all of this. But if the Court is inclined to place the child with [the grandmother], if there could be some sort offor example, the previous order had the child in [the mother's] custody, but residing at [the grandmother's]. I don't know if the Court could issue a joint custody [order] between [the grandmother] and [the father] or not. But that would be my request.
In response to these representations, the mother's attorney advised the court that the father had voluntarily relinquished custody of S.G. to the mother several years earlier. Counsel produced an agreement, signed in the City of Virginia Beach, Virginia, on August 22, 1983, which provided that
[[t]he mother and the father], parents of [S.G.], met in the mediation program, and agreed that it is in her best interest for custody to be granted to [the mother] *783 with liberal rights of visitation to [the father][17]
After hearing from counsel, the judge held that it was in the best interest of all four children to continue to reside with their maternal grandmother. He stated that he would not award any form of custody, individual or joint, to the father in the absence of a home study, but that the court's disposition would be without prejudice to a request for modification following the completion of such a study. The court authorized liberal visitation between the father and his daughter. The father's counsel again objected, citing D.C.Code § 16-2320(a)(3)(C) (1989),[18] and asserted that the court had denied the father his right to custody of his child, emphasizing that the father had not consented to the placement of S.G. outside her parents' home. The judge correctly explained, however, that the father was in no position to interpose an objection based on this provision because his Norfolk residence was not S.G.'s home.
Following the disposition hearing, the father filed a timely motion for reconsideration. He contended that, as a result of the court's order, S.G. had lost her eligibility for the military benefits to which she was previously entitled as a dependent of her father. He claimed that there was no legal basis for granting custody to the grandmother rather than to him, because there had been no finding that he, or indeed either parent, had neglected S.G. He contended that he had been denied his rights as a father without due process of law. On April 18, 1988, the judge entered a comprehensive written order denying the father's motion. In re S.G., 116 Daily Wash.L. Rptr. 1149 (Super.Ct.D.C.1988).

B. The propriety of the court's order.
The father contends that the court was without authority to order that S.G. be placed with someone other than her mother or father, because neither parent was found to have neglected her. We do not agree.
The court's authority to place S.G. with her grandmother pursuant to D.C. Code § 16-2320(a)(3)(C) (1989) is contingent by its terms on a finding that S.G. had been neglected. For purposes of this case, a neglected child is one who has been abused by her "parent, guardian, or other custodian." D.C.Code § 16-2301(9)(A) (1989). A custodian is defined as including a person who is acting in loco parentis. Id., § 16-2301(12). On appeal, the father argues for the first time that the stepfather was not S.G.'s custodian, and not acting in loco parentis, because he was not sufficiently involved with her care. The father did not make this contention in the trial *784 court, but instead argued in support of a finding that the stepfather abused S.G. Accordingly, this contention has not been adequately preserved. D.D. v. M.T., 550 A.2d 37, 48 (D.C.1988).[19]
Because the judge found that S.G. had been neglected, he had the authority to enter a disposition in her best interest. "If a child is found to be neglected, the [court] may order" any of several enumerated dispositions "which will be in the best interest of the child." D.C.Code § 16-2320(a) (1989). Nothing in the statute requires that a finding of neglect must first have been entered against a non-custodial parent before the court may order a disposition over that parent's objection. Even if the statute were ambiguous on that scoreand it is notit should be construed in a manner that would enable the court to act as parens patriae in the best interest of the child. In re S.K., supra.
The trial judge also had ample basis for his finding, which he made by clear and convincing evidence, that placement with the grandmother was in S.G.'s best interest. In his post-trial order, he summarized the facts supporting that determination as follows:
1) [S.G.] has three half-siblings who are also presently in the custody of the maternal grandmother. The present placement therefore maintains the family unit and preserves [S.G.]'s relationship with these siblings.
2) [S.G.] indicated to the social worker that her preference is to remain with her grandmother and have visitation with her father.
3) The present placement allows [S.G.] to remain in Washington, D.C. where she has lived for most of her life. Her mother is in D.C. and can visit frequently with the child and her siblings.
4) [S.G.] has never lived with [her father]. Placing her in his custody would mean thrusting her into a totally unfamiliar environment.
5) [S.G.] can have just as much contact now with her natural father as she had before these proceedings.
6) No home study has been provided on [the father] and the Court is not likely to receive one in the near future.
116 Daily Wash.L.Rptr. at 1155.
The foregoing findings belie the assertion in the father's brief that the court did not consider the father's right to custody and "ignored" the father's home. To the contrary, the judge declined to place S.G. in the father's custody, at least in part, because his home would have been a "totally unfamiliar environment" for S.G. Significantly, the father, who had signed an agreement providing that it was in S.G.'s best interest to live with her mother, never presented any evidence to rebut the judge's understandable concern about removing S.G. from her roots.
The father cites a number of decisions in cases resolving private custody disputes for the proposition that a parent may not be deprived of the custody of a child without a finding that he or she is unfit. See, e.g., Johnson v. Lloyd, 211 A.2d 764 (D.C. 1965); Davis v. Jurney, 145 A.2d 846 (D.C. 1958); cf. In re H.R., 581 A.2d 1141 at 1143 (D.C.1990) (per curiam), and authorities there cited.[20] Neither Johnson nor Davis involved a proceeding by the government to protect the interests of an abused *785 or neglected child. Accordingly, the court's explicit statutory authority pursuant to Section 16-2320 to order placement of a neglected child in the best interest of that child did not come into play in any of these cases. See also In re N.M.S., 347 A.2d 924 (D.C.1975), in which we sustained a trial court decision holding that a girl who had been committed as a dependent child should remain with her foster parents, rather than being returned to her mother who, like the father in this case, had never lived with the child, and who was thus seeking to "regainnot retaincustody." Id. at 927.
We have consistently held, and now reiterate, that a child's best interests are presumptively served by being with a parent, provided that the parent is not unfit. See, e.g., In re S.K., supra, 564 A.2d at 1390; In re N.M.S., supra, 347 A.2d at 927. The trial judge explicitly recognized and accommodated the existence of that presumption.[21] Noting that the present case involved only a temporary custody determination, the judge nevertheless applied the standard applicable to permanent curtailments of parental rights and found by clear and convincing evidence that placement with the grandmother was in S.K.'s best interest. We are therefore satisfied that the father's presumptive rights as a parent were accorded the requisite consideration.
Contrary to the father's apparent contention on appeal, we do not think that he had been lulled by the trial judge into not pressing his claim to physical custody. At the conclusion of the factfinding hearing, after directing that the children remain with the grandmother pending disposition, the judge authorized the father's counsel to file "whatever motion or request" she wished with respect to such issues as custody and visitation. In other words, the judge made it plain that the father was not foreclosed from pursuing his rights and that the court's final resolution of S.G.'s custody would be accomplished at the disposition hearing. There is no basis for any claim of surprise; indeed, at the disposition hearing, no claim of surprise was made.
Finally, we discern no factual basis for the father's assertion that S.G. lost her entitlement to military benefits as a result of the trial court's disposition. The father did not have custody of S.G. either before or after the entry of the order. The applicable regulations established that the court's disposition had no effect on S.G.'s right to receive military medical or related benefits. A child born out of wedlock whose father is a male member of the armed forces on active duty is entitled to receive CHAMPUS benefits if paternity has been determined judicially; if paternity has not been so determined, benefits are available if the child "resides with or in a home provided by" the member of the armed forces and if the child is dependent upon the member for over 50 percent of his or her support. 32 C.F.R. § 199.3(b)(2)(iv)(A)(4) and (5) (1989). Accordingly, S.G.'s eligibility for CHAMPUS benefits was not dependent on an award of legal custody. If there had been a previous judicial determination of the father's paternityand the record is silent as to whether this had occurredthen S.G. was eligible for benefits regardless of the disposition of this case. If there had been no such determination, S.G. had never been eligible for benefits because she had not been living with her father.[22]

IV

CONCLUSION
By the time the trial judge entered his disposition order, S.G., who is described in the testimony as an outstanding and intelligent *786 child, had been through a great deal. She had been sexually abused on several occasions by an inebriated stepfather who turned what should have been a carefree girlhood into an ordeal which no young child should ever have to endure. She received, at best, marginal protection and comfort from her mother. She was compelled to testify in court, in front of strangers, about the most private (and in her case frightening) experiences.
The law would indeed be a cold and merciless institution if it now required S.G., contrary to her stated wishes, to leave her grandmother and mother and brother and sisters and friends and school and move to an unfamiliar environment to live with a father with whom she had not previously resided in a home of which she (and the judge) knew little or nothing. We think that the judge acted in conformity with his responsibilities as parens patriaethe children's protectorin ordering the placement which would best ensure their well-being and thus vindicate the interests which our remedial legislation in behalf of abused and neglected children was designed to secure.
For the foregoing reasons, the decision of the trial court must be and it is hereby in all respects
Affirmed.
ROGERS, Chief Judge, with whom FERREN, Associate Judge, joins, concurring:[*]
I write separately to clarify how the parental preference applies with respect to the contentions of S.G.'s natural father. Judge Schwelb assumes without deciding that the parental preference applies to the temporary placement of a neglected child under D.C.Code § 16-2320 (1989 Repl.). See opinion of Judge Schwelb at [21]. There can be no doubt that the presumption applies. See In re H.R., 581 A.2d 1141 (D.C.1990). The statute itself refers to the presumption: "It shall be presumed that it is generally preferable to leave a child in his or her own home." D.C.Code § 16-2320(a). Further, the statute precludes placement of a child with a relative or other individual in the absence of a finding that "the child cannot be protected in the home and there is an available placement likely to be less damaging to the child than the child's own home." Id. at § 16-2320(a)(3)(C). While I agree with the trial judge, and Judge Schwelb, (see his opinion at [26] n. 18), that S.G.'s natural father is not in a position to argue that S.G. was ever in his home, I nonetheless view the statute to incorporate the basic principle underlying the parental preference, namely, that a child's best interests usually will be to be in the custody of his or her natural parent or parents. The trial judge, therefore, properly proceeded on the basis that the parental presumption was applicable.[1]
Furthermore, to leave unclear whether the parental preference applies to temporary custody orders would ignore the reality that such orders may effectively become permanent as a result of the delays attendant to litigation and appeal. S.G. was first ordered by the court to live in her maternal grandmother's home on August 24, 1987.[2] Therefore, it behooves a trial judge, in view of the statutory language, to accommodate, in appropriate cases, the interests of the parties by assuring continuing contacts between the natural parent or parents and the child, and by developing transitional arrangements aimed at returning the child to his or her natural parent or parents *787 whenever a temporary custody order placing the child in the custody of a nonparent is required.
Here, the trial judge found that S.G. had been neglected by her stepfather but that the government had failed to meet its burden of proof that the mother had neglected her. The natural father of S.G. sought permanent custody of S.G. and filed an expedited motion for reconsideration of the judge's order placing her in the temporary custody of her maternal grandmother for an indeterminate period not to exceed two years.[3] According to the judge's order denying the motion for reconsideration, the natural mother and maternal grandmother had agreed that S.G. and the other three children would be temporarily placed in the grandmother's home. The trial judge had previously suggested, at the end of the factfinding hearing, that S.G. remain with the mother with restrictions on the stepfather's access to S.G., but was advised that the children were already living with the maternal grandmother. Thus, in denying the father's motion, the judge, in effect, left S.G. in the custody of her mother in the sense that the judge confirmed the arrangements that the mother had made for the children to live with the grandmother. The judge ordered that S.G.'s natural father was to have "liberal rights of visitation," and rejected the father's contention that in the absence of a finding of unfitness he was entitled to custody of S.G., viewing the neglect proceeding not to be the proper place for a custody dispute between S.G.'s natural parents.
S.G.'s natural father claimed, in objecting to the maternal grandmother's petition for custody of S.G. and the three other children, that he was "ready, willing, and able to care for her." See Judge Schwelb's opinion at [23]. By so doing, he preserved his right to object of the order placing temporary custody of S.G. with the maternal grandmother. The trial judge acknowledged the father's parental preference but found by clear and convincing evidence that S.G.'s best interests for the immediate future lay in remaining in the city in the setting where she had lived all of her life with her siblings. The judge noted that the natural father had never been a custodial parent of S.G., having agreed to place S.G. in the custody of her natural mother, and that prior to this proceeding he had never sought custody himself. Relying on Quillon v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978), the judge concluded that due process was not offended by placing S.G. in the temporary custody of her maternal grandmother "solely upon the finding that this placement is in her best interests." "This arrangement permits the child to remain with her siblings in close proximity to her mother, and preserves the pre-existing family unit as best as possible under the circumstances." The judge further found that this disposition did not affect the relationship that the natural father has had with S.G. as a noncustodial parent. The judge acknowledged that the natural father could file a motion seeking permanent custody of S.G. at any time.
As a noncustodial parent who had previously surrendered custody of S.G. to her natural mother for a number of years, and who had never previously sought permanent custody of the child himself, the natural father is not in the same position as one who has grasped his "opportunity interest." See generally In re H.R., supra. Consequently, what might have presented a problem had the natural father grasped his opportunity interest, namely, that the judge never made any findings regarding the father's fitness and, therefore, would have an insufficient factual basis for determining where S.G.'s best interests lay, is *788 not present here. The judge could properly conclude, in view of the noncustodial natural father's failure to present evidence to the contrary,[4] that maintaining S.G.'s status quo was in her best interests, notwithstanding the judge's acknowledgment that he had insufficient information about S.G.'s natural father, referring to the absence of a home study and the unlikely prospect of receiving such a study in the near future. Accordingly, I concur in the affirmance of the judgment temporarily placing S.G. in the home of her maternal grandmother.
NOTES
[1] The two appellants in this case are S.G.'s stepfather, J.B. and her natural father, B.G. In this opinion, we refer to them respectively as the stepfather and the father. Code § 1-1320(b).
[2] S.G. testified that there were four separate incidents of abuse.
[3] S.G.'s matter-of-fact description of the oral sodomy during her testimony vividly and yet poignantly portrayed the sordid horror of this kind of exploitation of innocent children.
[4] See In re N.H., 569 A.2d 1179, 1181-82 (D.C. 1990); In re B.K., 429 A.2d 1331, 1333 (D.C. 1981).
[5] To the extent that criminal cases are triable by jury, however, they are plainly distinguishable from the present case, for judges are trained to compartmentalize admissible and inadmissible evidence; this may often prove to be a Herculean task for lay jurors. See discussion at pages 776-777 & note 7, infra.
[6] The court was quoting from Ginsberg v. United States, 390 U.S. 629, 640, 88 S.Ct. 1274, 1281, 20 L.Ed.2d 195 (1968).
[7] We are not alone in this approach. As the court stated in United States v. Menk, 406 F.2d 124, 127 (7th Cir.), cert. denied, 395 U.S. 946, 89 S.Ct. 2019, 23 L.Ed.2d 464 (1969),

[t]rial judges are invariably called upon to conduct impartial trials despite whatever opinion they may have or which they may formulate during the course of the trial concerning the guilt or innocence of an accused. Such impartiality is precisely what is expected of them, and an experienced trial judge must be assumed capable of performing his essential function. [Citation omitted].
See also People v. Smith, 264 Cal.App.2d 718, 722, 70 Cal.Rptr. 591, 594 (1968):
It must be conceded that judges are subject to human frailties, but, unlike a juror, a judge is presumed able by training and experience to hear voir dire testimony concerning the admissibility of a confession or admission and not be affected in his judgment by either the knowledge that a inadmissible statement was made by the defendant, or by what he hears during the voir dire.
A realistic assessment of the limits of the assumption on which the foregoing authorities are predicated was articulated by Judge Wilkey for the court in United States v. Walker, 154 U.S. App.D.C. 6, 8, 473 F.2d 136, 138 (1972):
The District Judge is presumed to have a trained and disciplined judicial intellect, which in a nonjury trial can receive evidence, rule on its admissibility, and discard from his [or her] eventual decision on the merits that evidence which he has ruled to be inadmissible for the purposes of his decision. This mental discipline is supposed to be part of the resources which the trial judge brings to his [or her] task.
* * * * * *
It seems of some measurable difficulty for a trial judge to disassociate himself [or herself] from the knowledge that one of the defendants has offered a plea of guilty in connection with an armed robbery and assault, when that defendant and others are testifying on the stand that he wasn't there at the time the offense was undeniably committed by someone. The disciplined judicial mind should not be subjected to any unnecessary strain; even the most austere intellect has a subconscious.
In spite of these perceptive observations, Walker's conviction was affirmed; the court did make some sound prophylactic suggestions for avoiding the problem in the future. Id. at 9, 473 F.2d at 141.
[8] The judge made no allusion to the three younger children in his original Findings of Fact. The language quoted above is contained in his Conclusions of Law.
[9] This allusion was contained in a finding which focused on the mother's conduct. The judge found that while the mother may not have been "affirmatively neglectful," her responses to S.G.'s complaints were only "marginally adequate." The judge perceived a possible link between the mother's deficient performance and her addiction to cocaine, which was revealed in the social worker's post-trial disposition report, though not during the factfinding hearing.
[10] "Sibling" is not defined in the statute, but courts in several other child abuse cases have treated half-siblings as siblings. See text, infra, at 778-779. The stepfather has not raised the question whether the three younger children are S.G.'s "siblings" within the meaning of the statute, and we do not formally decide it. We note, however, that one definition of sibling, probably the most appropriate here, includes "one of two or more persons having one common parent." WEBSTER'S NEW COLLEGIATE DICTIONARY 806 (1970).
[11] But see In re S.K., supra, 564 A.2d at 1391 n. 13 (concurring opinion), citing studies suggesting that child abuse does not ordinarily consist of a single isolated act of molestation, and that substantial numbers of child abusers have harmed several siblings in the same family. This kind of information is, of course, relevant to a determination whether the three younger children in this case were in imminent danger of abuse or neglect.
[12] Both parents, who had previously adopted the two children, entered pleas of guilty to criminal child abuse and were sentenced to imprisonment for one year. This may explain the extent of the relief granted.
[13] No party in this case has asked us to accept or reject the "child abuse syndrome" analysis, and we have no occasion to do either here.
[14] The stepfather contends that the younger child was asleep at the time. Assuming this to be true, we find the mitigating character of such a fact to be less than overwhelming. What if the child had woken up?
[15] The stepfather contends that the government predicated its request for a finding of imminent danger with respect to the younger children on its allegation that the mother neglected S.G. by failing to protect her. He argues that since there was no finding of neglect made against the mother, there is no basis for the court's action vis-a-vis these children. The government proved, however, and the trial judge found, that the mother was unable to protect S.G., and that S.G. was abused by the stepfather. Under these circumstances, the decision as to the fate of the younger children does not turn on whether that failure on the part of the mother rose to the level of child neglect, but on the judge's assessment of the resulting danger to these children.
[16] Given the unspeakable acts that had allegedly been perpetrated on S.G., we disagree with the government's position, urged for the first time on appeal, that it was improper for the court to appoint counsel for her father. A parent, whether custodial or non-custodial, should have a meaningful right to be heard on what disposition would be most appropriate for a child in these trying circumstances. See D.C.Code § 16-2304(b)(1) (1989) providing in pertinent part that "when a child is alleged to be neglected..., the parent, guardian or other custodian of the child named in the petition ... is entitled to be represented by counsel at all critical stages of the proceeding." As a matter of syntax, the words "named in the proceeding" qualify "the child," not "the parent, guardian or other custodian."

Super.Ct.Neglect R. 20(a) is not to the contrary. It specifies only that separate counsel shall appear for the child and any parent or other party charged with neglect. The Comment to the Rule provides that "mandatory separate counsel for the child and his parents seems essential in neglect cases, since important custody questions are at stake and since the Corporation Counsel often in effect represents [a different interest]." Obviously, custody issues are as important to parents not charged with abuse or neglect as they are to the alleged perpetrators. In any event, even if the Rule could be read, as the government suggests, as authorizing counsel only for an accused parent, that construction must be avoided as it is inconsistent with the statute.
The government acknowledges that the father "may have had a right to be heard at disposition," but apparently thinks that he should have been compelled to defend his rights pro se. We are unwilling to give the statute such a crabbed reading.
[17] The father contends in his brief that the judge "improperly" took notice of this agreement, claiming that it was not technically placed in evidence and that the judge first saw it as an appendix to the grandmother's post-hearing brief. The judge stated in his decision that the substance of the agreement was before him as a result of the testimony. In re S.G., 116 Daily Wash.L.Rptr. 1149 1155 (Super.Ct.D.C. 1988). In any event, we have made it clear that such a technical defectif there was onewill not be accorded primacy over the best interest of a child. In re N.H., supra, 569 A.2d at 1184. It is significant that the father does not contest the authenticity of the agreement. Given its existence and the fact that S.G. had always lived with her mother, the father's reliance on Martin v. Tate, 492 A.2d 270, 273 (D.C.1985), for the proposition that joint custody between natural parents is presumed, is of no avail to him here. Any such presumption has obviously been rebutted in this case.

There had, of course, been a change of circumstances since the father signed the agreement consenting to S.G.'s placement with the mother in the best interest of the child. Specifically, it had been determined that S.G. had been sexually abused in the mother's custody, that the mother herself was addicted to cocaine, and that S.G. should live for the time being with her grandmother rather than with her mother. Accordingly, the agreement cannot be viewed as a waiver of the father's custodial rights under the changed circumstances.
[18] This section provides in pertinent part that "no child shall be ordered placed outside his or her home unless the [court] finds [that] the child cannot be protected in the home and [that] there is an available placement likely to be less damaging to the child than the child's own home. It shall be presumed that it is generally preferable to leave a child in his or her own home." Obviously, the father's home in Norfolk, where S.G. had never resided, was not her "home" at which the court could "leave" her.
[19] In any event, the stepfather was plainly acting in loco parentis vis-a-vis S.G. He lived in the same house with her. He was married to S.G.'s mother and was the only male adult, or father figure, in residence. It would be counterproductive in the extreme to hold that a stepfather's abusive conduct falls within the ambit of remedial legislation designed to shield a child from harm only if he was devoted to his stepchild or effective in his role as a substitute parent. Indeed, the rule for which the father now contends would make it more difficult to protect a child from a bad stepfather than from a good one. This is not a result which the legislature is likely to have intended. S.G. was abused in her own home, and it would be incongruous, and contrary to any reasonable interpretation of legislation designed to protect children, to deny the court the authority to act on S.G.'s behalf because the stepfather who abused her was insufficiently attentive to her needs.
[20] The court also stated in Davis, however, that "the paramount concern is the child's welfare and all other considerations, including the rights of a parent to the child, must yield to its best interest and well-being." 145 A.2d at 849.
[21] The judge stated in his written order that "In Shelton v. Bradley, [526 A.2d 579 (D.C.1987)] the clear and convincing evidence standard was applied to an attempt to overcome the statutory presumption that the natural father was entitled to custody upon the death of the natural mother." 116 Daily Wash.L.Rptr. at 1155.
[22] If the father had gained custody of S.G. as a result of the court's disposition, and if she was previously ineligible for benefits, the order might have made her eligible for the first time. The father's thesis in the trial court, however, was that the court's order destroyed S.G.'s pre-existing right to receive benefits.
[*] The concurring opinion represents the opinion of the court with respect to the issue addressed therein.
[1] In addressing the stepfather's claim to his children, Judge Schwelb relies on In re S.K., 564 A.2d 1382 (D.C.1989), for the proposition that in neglect proceedings the best interest of the child is the paramount consideration. See his opinion at [15]. However, in S.K. the court was not addressing the requirements of the parental preference, as is discussed by the court in In re H.R., 581 A.2d 1141 (D.C.1990), but was contrasting the differences between the criminal and civil neglect proceedings. 564 A.2d at 1388. See also id. at 1390 citing In re N.M.S., 347 A.2d 924, 927 (D.C.1975) (child's best interest presumptively served by being with nonabusive or otherwise nonunfit parent).
[2] See note 3, infra.
[3] At the conclusion of the initial hearing, the trial judge had placed S.G. in the legal custody of her natural mother but directed that she reside at the home of her maternal grandmother. On September 2, 1987, the judge directed that the D.C. Department of Human Services conduct a home study of S.G.'s natural father's residence "with a view toward placement." In response to the maternal grandmother's petition for custody of all four children, S.G.'s natural father opposed the petition, noting that at all times during the pendency of this petition he has stated that he wants custody of S.G. and is, as of January 14, 1988, awaiting a home study by the authorities.
[4] In denying the father's motion for reconsideration, the judge noted that the father had failed to present evidence that would cause the court to conclude that placing S.G. in his custody would be in her best interests.